# In the
# United States Court of Appeals
## For the Seventh Circuit

_____

No. 04-1025

ALLEN TEGTMEIER,

*Plaintiff-Appellant,*

*v.*

MIDWEST OPERATING ENGINEERS
PENSION TRUST FUND,

*Defendant-Appellee.*

_____

Appeal from the United States District Court for
the Northern District of Illinois, Eastern Division.
No. 03 C 2386—**Ruben Castillo**, *Judge.*

_____

ARGUED SEPTEMBER 28, 2004—DECIDED DECEMBER 7, 2004

_____

Before BAUER, EASTERBROOK , and MANION, *Circuit Judges.*

MANION, *Circuit Judge.* Allen Tegtmeier sued the Midwest
Operating Engineers Pension Trust Fund (the "Pension
Fund") for improper administration and breach of fiduciary
duties under the Employee Retirement Income Security Act
("ERISA"), 29 U.S.C. §§ 1001, *et seq.*, alleging the defendant
improperly calculated his disability award. Both parties
moved for summary judgment, and the district court
granted the Pension Fund's motion. Tegtmeier appeals. We
affirm.

## I.

### A.  The Plan at Issue

Allen Tegtmeier was an operating engineer who partici-pated in the Midwest Operating Engineers Pension Plan (the "Pension Plan"), which the Pension Fund administers. The Pension Plan addresses when a disability pension begins, providing that "the payment of a total and permanent disability pension shall be effective as of the first day of the month next following the date *the participant files an appli-cation* for total and permanent disability pension . . . ." (Emphasis added.) Thus, the date a person becomes dis-abled does not trigger payment of disability benefits; rather, benefits begin the month following the date the participant applies for the pension.

In 2001 and 2002, special significance attached to this effective date under the Pension Plan because of a major change to another plan covering Tegtmeier, the Midwest Operating Engineers Health and Welfare Plan (the "Health and Welfare Plan"). This plan also provided benefits to a disabled member, though the benefits only lasted for one year. Beginning in April 2000, the Health and Welfare Plan began a transition in welfare payment rates by members. Through 2001, all members paid the same monthly rate to the Health and Welfare Fund for welfare benefits received during a participant's retirement or when the participant was receiving disability benefits.[1] In an effort to reward seniority, however, the Health and Welfare Fund trustees decided to implement a new schedule beginning in January

---

[1]  While the pre-2001 Health and Welfare Plan rates did change based on the different type of services sought by the participant (retiree, retiree and dependent, etc.), the rates did not alter based on years of service.

2002.[2] This new schedule provided that participants with less seniority would pay greater monthly welfare rates in the case of retirement or disability than under the previous flat rate, while those with greater seniority (and who had paid greater amounts to the Health and Welfare Fund over the course of their careers) would pay less than under the pre-existing flat rate. This meant, in many cases, that if a participant filed for a disability pension before January 1, 2002, he would pay much less in monthly rates than if he filed after January 1, 2002, when the new scheduled kicked in. For a participant of ten to fourteen years seniority who became disabled, such as Tegtmeier, it was the difference between paying a monthly rate of $237 to the Health and Welfare Fund (pre-2002 effective date of disability) and paying a monthly rate of $519 to the Health and Welfare Fund (post-2002 effective date of disability).

In addition to the effective date, the second provision of particular importance in this case concerns the claims administration procedure after an application is filed. For applications filed before January 1, 2002, Section 9.2 of the Pension Plan applies. This section states, in relevant part:

   (a) Unless special circumstances exist, a Participant shall be informed of the Trustees' decision on his claim within 90 days of the date the claim is received, whether or not all the information and evidence necessary to process the claim is received. Within such 90-day period, the Participant shall receive the Administrative Manager's decision or a notice that:

   (i) explains the special circumstances requiring a delay in the decision, and

_____

[2] According to Pension Fund documents, Tegtmeier was informed of the change in schedule in November 2001.

(ii) sets a date, no later than 180 days after his claim has been received, by which he can expect to receive a decision.

The Participant may assume that his claim has been denied and may proceed to appeal the denial if the Participant does not receive any notice from the Administrative Manager within the 90-day period.

The remainder of Section 9.2 details what should be contained in a notice from the Administrative Manager and the review procedure when an application for benefits has been disapproved.

## B. Tegtmeier's Disability

Tegtmeier injured his back at work on July 12, 2001. Following this injury, he began to receive weekly disability benefits from the Health and Welfare Fund that had a one-year period of eligibility, ending on July 11, 2002. Tegtmeier did not immediately seek disability benefits from the Pension Fund (which would have displaced payments from the Health and Welfare Fund). In fact, he did not inquire into obtaining these pension benefits until October 10, 2001. The next day, the Pension Fund sent him an application, which he did not return until November 30, 2001, the last date to qualify as a 2001 filing.

After filing his application, however, Tegtmeier showed reluctance to proceed with the actual determination of his disability status under the Pension Plan. On January 25, 2002, the Pension Fund sent Tegtmeier a letter stating that it did not have sufficient information to process his claim. The Pension Fund noted that he had failed to provide a Medical Examiner's Report and gave him until March 11, 2002, an

additional forty-five days, to comply. The letter ended with the warning: "[i]f you do not provide this information, your claim will be denied."

Instead of providing this information promptly, Tegtmeier waited nearly a month before taking action. At that time, Tegtmeier talked to an unidentified person at the Pension Fund, who told him that he could put his application on hold. Tegtmeier then wrote a letter on February 26, 2002, received by Judith Kot of the Pension Fund, requesting that the Pension Fund put his application on hold.

> Please put my application for my disability pension on hold. As of this date, I have not had my surgery. I've been advised even with a successful [sic] procedure, I should not return to operation of rough riding heavy equip. ie. [sic] Dozers, Earthmovers, Loaders, etc. [sic] My situation is still uncertin [sic] and at this time I feel this is in my best interest.

There is no record of any response by the Pension Fund to Tegtmeier's note.

On May 2, 2002, the Pension Fund sent Tegtmeier another letter requesting medical records. This May letter referenced the earlier letter and forty-five day extension, stating "[t]his is to notify you that we have not received all medical records to date." The Pension Fund asked for updates on all notes from January of 2002 onward and gave another forty-five day extension, which ended on June 16, 2002. On May 5, 2002, Tegtmeier responded to this letter, stating that he had surgery scheduled for May 29, 2002, and "request[ed] another extension of at least 45 days or more." There is no record of any response by the Pension Fund to Tegtmeier's letter. Tegtmeier underwent back surgery on May 29, 2002.

On July 12, 2002, Tegtmeier called the Pension Fund to discuss the status of his application. The Pension Fund

stated that he would need to file a new application with medical documentation. Kot sent him a new application, which Tegtmeier completed and filed on July 30, 2002. The next day, he sent the Pension Fund a letter stating in pertinent part:

> I hereby request that my initial application for disability dated Nov. 01 be still in affect [sic] . . . . I had no idea the importance of maintaining this Nov. 01 date due to Program changes, ie. [sic] effects, afterwards [sic] . I believe I was not completely informed and actually was vaguelly [sic] mislead [sic].

Despite Tegtmeier's pleas, the Pension Fund Review Board approved the July 2002 application for disability benefits (with an effective date of August 1, 2002) and denied his request to use the date of his first application for determining the monthly payments he owed to the Health and Welfare Fund. The Review Board explained that "[y]ou put your pension application on hold in February of 2002 and then notified the Fund in May 2002 that you were not ready to apply for pension. The Fund closed the application process and requested that you submit a new application when you were ready to pursue it."

Tegtmeier appealed the Review Board's decision to the Pension Fund Appeal Review Panel, which initially denied the appeal. Tegtmeier then asked for reconsideration, which led to a hearing as well as a November 19, 2002 decision from the Review Panel that was "final, conclusive and binding." Before the Review Panel, Tegtmeier acknowledged that he was "attempting to obtain the highest level of benefits during his rehabilitation to support his family," but indicated that he had misunderstood the consequences of waiting to proceed with his disability pension application. According to Tegtmeier, had he known that his delay would result in the higher rate, "he would not have made the

financial decision to continue receiving welfare benefits instead of accepting pension benefits." The Review Panel concluded that the Pension Fund acted reasonably when treating the 2002 application as a new application, "since the first application had been stopped, more than 90 days had passed since the first application, and it is unknown whether Mr. Tegtmeier's first application for benefits would have been approved prior to surgery."

On February 29, 2003, Tegtmeier attempted to reopen his claim in the light of a favorable Social Security Administration decision from January 2003 that found him totally disabled since July 2001. The Pension Fund advised Tegtmeier that it would not reopen the appeal process.

Tegtmeier responded by filing his ERISA suit in the Northern District of Illinois, claiming that the Pension Fund improperly administered his claim and that employees of the Pension Fund breached their fiduciary duties by misrepresenting the effect of Tegtmeier's attempt to put his initial application on hold. Both parties moved for summary judgment. The district court granted summary judgment to the Pension Fund, concluding that it did not act arbitrarily or capriciously when treating the July 2002 application as a new application. Further, the district court found that the Pension Fund employees had not breached their fiduciary duties in their interactions with Tegtmeier. This appeal followed.

## II.

"We conduct de novo review of a district court's decision involving cross-motions for summary judgment." *Metro. Life Ins. Co. v. Johnson*, 297 F.3d 558, 561 (quoting *Ozlowski v. Henderson*, 237 F.3d 837, 839 (7th Cir. 2001)). Summary judgment is proper when the "pleadings, depositions, an-

swers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c)). "With cross-motions, our review of the record requires that we construe all inferences in favor of the party against whom the motion under consideration is made." *Johnson*, 297 F.3d at 561-62 (quoting *Hendricks-Robinson v. Excel Corp.*, 154 F.3d 685, 692 (7th Cir. 1998)).

**A.**

On appeal, Tegtmeier first asserts that the Pension Fund improperly administered his claim for disability benefits. Specifically, Tegtmeier argues that the Pension Fund acted unreasonably when it refused to set December 2001 as the effective date of his benefits pursuant to his initial application. As mentioned above, the effect of the Pension Fund's decision was that his monthly benefit rate under the welfare plan was $519 rather than $237. Tegtmeier also attacks the Pension Fund for its decision not to reopen his claim in light of the January 2003 Social Security determination that he was permanently disabled.

As a general matter, we review a benefits determination under ERISA under the "de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Mers v. Marriott Int'l Group Accidental Death & Dismemberment Plan*, 144 F.3d 1014, 1019 (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)). In this case, both parties agree that the Pension Plan grants the trustees of the Pension Fund complete discretionary authority to construe, interpret, and apply all of the terms of the Plan. When a plan gives discretion, as in this case, we

review using the deferential arbitrary and capricious standard. *See Mers*, 144 F.3d at 1019. Under this standard, the administrator's decision will only be overturned if it is "downright unreasonable." *Carr v. Gates Health Care Plan*, 195 F.3d 292, 295 (7th Cir. 1999). "It is not our function to decide whether we would reach the same conclusion as the Plan or even rely on the same authority." *Id.* at 294. If the administrator made an informed judgment and articulates an explanation for it that is satisfactory in light of the relevant facts, then that decision is final. *See Exbom v. Cent. States, S.E. & S.W. Areas Health & Welfare Fund*, 900 F.2d 1138, 1143 (7th Cir. 1990).

Given this highly deferential standard, we cannot say that the Pension Fund acted unreasonably in its treatment of Tegtmeier's initial application. The Pension Fund has put forth several facts to justify its decision: (1) Tegtmeier's attempt to put his application "on hold" in early 2002; (2) Tegtmeier's repeated requests for extensions to submit medical documentation; (3) the Pension Fund's decision to close the claim after more than 180 days had passed without progress; and (4) Tegtmeier's acknowledgment in February 2002, and prior to his operation scheduled for May 2002, that his status was uncertain. Taken together, these facts present a picture of Tegtmeier attempting to game the system by delaying the processing of his pension benefits in the hopes of garnering a larger overall benefit payout, a fact which Tegtmeier apparently acknowledged before the Review Panel. Unfortunately for him, Tegtmeier did not adequately understand the rules of the game—namely, the provisions of the Pension Plan—and the negative effect of his actions on his benefits.

The Pension Fund's decision to proceed with the July 2002 application was reasonable in light of the terms of the

Pension Plan and the facts available to the Pension Fund administrator. *See Perlman v. Swiss Bank Corp. Comprehensive Disability Protection Plan*, 195 F.3d 975, 982 (7th Cir. 2000) ("When review under ERISA is deferential, courts are limited to the information submitted to the plan's administrator."). Tegtmeier did not proceed with his initial application. Instead of providing necessary medical documentation for his disability and going forward with the November application, Tegtmeier repeatedly asked for extensions to gather additional medical support. Further, Tegtmeier told the Pension Fund that his status was uncertain both in February and before his surgery in May. These facts give the impression that Tegtmeier did not want to proceed or could not proceed with the determination of any disability under the November application. The Pension Plan provided for a set procedure of 90 or 180 days to resolve claims. After more than 180 days and numerous extensions, the Pension Fund acted reasonably when it deemed his November application closed or withdrawn.[3]

This conclusion is not altered by Tegtmeier's attempts to put a hold on his claim. The Pension Plan does not provide for such a time extension procedure. Moreover, the Pension

---

[3] Tegtmeier suggests that he was denied his right to appeal the Pension Fund's actions relating to this first application, as the Pension Fund did not serve him with a notice of decision. Tegtmeier, however, chose not to proceed, and, therefore, the Pension Fund did not need to send a notice of decision, as it was Tegtmeier who effectively stopped the process. Second, the Pension Plan specifically provides that if the member has not received a notice regarding the disability at the end of ninety days, the member should treat it as denied and appeal. Despite his decision not to proceed, Tegtmeier still could have appealed regarding the first application according to the Pension Plan terms.

Fund never responded to Tegtmeier's request for such a procedure. Instead, it persisted in its attempts to gather the necessary information to proceed with the claim, even allowing two 45-day extensions to respond. His claim was never on hold, nor could it be. The fact that Tegtmeier's strategic decisions, which did not comply with the terms of the Pension Plan, led to an unfavorable result is unfortunate, but it does not make the Pension Fund's actions unreasonable.

Tegtmeier also challenges the decision of the Pension Fund not to reopen his claim after receipt of a favorable Social Security Administration decision in January 2003. The Review Panel made its final decision regarding this matter on November 19, 2002. The Pension Plan specifically provides that this last stage review will be conclusive and binding. While Social Security decisions, if available, are instructive, these determinations are not dispositive (except in those cases where a plan ties benefits to the Social Security decision—this is not such a case). *See, e.g., Whatley v. CNA Ins. Co.*, 189 F.3d 1310, 1314 n.8 (11th Cir. 1999); *Coker v. Metro. Life Ins. Co.*, 281 F.3d 793, 798 (8th Cir. 2002). The Pension Fund's decision not to reopen the claims process is completely proper, given the Pension Plan's concern for finality of decisions. *See Admin. Comm. of Wal-Mart Stores, Inc. Assoc. Health & Welfare Plans v. Varco*, 338 F.3d 680, 691 (7th Cir. 2003); 29 U.S.C. § 1104(a)(1)(D).

Moreover, the Social Security determination would have no bearing on which benefits Tegtmeier should have received. Under the Pension Plan, the actual date of disability was not the crucial date for benefits purposes. Rather, the effective date for benefits depended on the date of the filing of the application. The Social Security determination merely indicated that Tegtmeier was disabled beginning in July 2001 and did not shed any light on the pivotal question of

which pension application, if either, had an effect on its decision. In such a situation, the Pension Fund's decision not to reopen this issue was reasonable.

**B.**

We next address Tegtmeier's claim that the Pension Fund employees breached their fiduciary duty to him under ERISA by misrepresenting his ability to put the initial application on hold. Under ERISA, a fiduciary must "discharge his interests with respect to a plan solely in the interest of the participants and beneficiaries." 29 U.S.C. § 1004(a)(1). "Fiduciaries breach their duty of loyalty and care if they mislead plan participants or misrepresent the terms or administration of a plan." *Anweiler v. Am. Elec. Power Serv. Corp.*, 3 F.3d 986, 991 (7th Cir. 1993). "Not all errors in communicating information regarding a plan violate a fiduciary's duty under ERISA, but 'material facts affecting the interests of plan participants or beneficiaries' must be disclosed." *Kamler v. H/N Telecomm. Serv., Inc.*, 305 F.3d 672, 681 (7th Cir. 2002) (quoting *Bowerman v. Wal-Mart Stores, Inc.*, 226 F.3d 574, 590 (7th Cir. 2000)).

Before determining whether a fiduciary duty has been breached here, we must first decide whether a fiduciary was involved. *See Schmidt v. Sheet Metal Workers' Nat'l Pension Fund*, 128 F.3d 541, 547 (7th Cir. 1997) ("It goes without saying that a claim for breach of fiduciary duty lies only against an individual or entity that qualifies as an ERISA 'fiduciary.' "). As Tegtmeier has identified Kot as the possible culprit responsible for making erroneous statements about his ability to put his pension application on hold indefinitely, we, like the parties, must inquire into her status as a fiduciary. When examining whether an employee or administrator actually is a fiduciary, we must concentrate

on the degree of discretion entrusted to that person. *See, e.g., Pohl v. Nat'l Benefits Consulting, Inc.*, 956 F.2d 126, 129 (7th Cir. 1992); *Schmidt*, 128 F.3d at 547.

Tegtmeier fails in his attempt to paint Kot as a fiduciary. He relies both on the Pension Plan's language as well as Kot's job responsibilities in this endeavor, but to no avail. First, Tegtmeier contends that Kot's position, as an individual charged with the day-to-day administration of the Pension Plan, by itself makes her a fiduciary. The Pension Plan does establish that "the Trustees may employ or retain the services of one or more individuals to carry out the day-to-day administration . . . of whom the chief executive shall be known as the 'Administrative Manager.' " This designation alone, however, does not transform someone into a fiduciary. *See Pohl*, 956 F.2d at 129 ("Which is not to say that a Plan Administrator can never be a fiduciary. That depends on its *powers*.") (emphasis added). Tegtmeier described several of Kot's responsibilities which he thought were discretionary in nature. As the Pension Fund notes, however, the United States Department of Labor regulations designate the administrative functions that Tegtmeier referenced as ministerial rather than discretionary. *See* 29 C.F.R. § 2509.75-8 ("A person who performs purely ministerial functions such as the types described above for an employee benefit plan within a framework of policies, interpretations, rules, practices and procedures made by other persons is not a fiduciary. . . ."). "In assessing whether a person can be held liable for breach of fiduciary duty, 'a court must ask whether [that] person is a fiduciary with respect to the particular activity at issue.' " *Plumb v. Fluid Pump Serv., Inc.*, 124 F.3d 849, 854 (7th Cir. 1997) (quoting *Coleman v. Nationwide Life Ins. Co.*, 969 F.2d 54, 61 (4th Cir. 1992)). Tegtmeier has not presented evidence that would allow us to conclude that Kot was anything but a ministerial employee for the activities Tegtmeier described.

While Kot is not a fiduciary, the Pension Fund might still be liable for breach of fiduciary duties if Kot, a ministerial employee, misrepresented the terms of the Pension Plan and the Pension Plan documents were not clear. *See Schmidt*, 128 F.3d at 548. Tegtmeier cannot succeed in this regard because the Pension Plan documents were clear. While it is true that neither the Pension Plan nor the Summary Plan Description addressed a "hold" on applications, they do not need to address every contingency. *See Herrman v. Cencom Cable Assoc., Inc.*, 978 F.2d 978, 984 (7th Cir. 1992) ("Larding the summary with minutiae would defeat that document's function: to provide a capsule guide in simple language for employees."). The Pension Plan clearly described the procedures for filing an application. Tegtmeier's attempt to create a new "hold" procedure, which never existed under the Plan, does not make the Plan defective, ambiguous, or incomplete. Tegtmeier is trying to use alleged oral statements to modify the Pension Plan, which ERISA forbids. *See Schoonmaker v. Employee Savs. Plan of Amoco Corp.*, 987 F.2d 410, 412 (7th Cir. 1993). As the Pension Plan documents were clear, there was no breach of fiduciary duty.

In an attempt to make a showing of breach of fiduciary duty, Tegtmeier relies heavily on *Bowerman v. Wal-Mart Stores, Inc.*, 226 F.3d 574 (7th Cir. 2000). *Bowerman* was a situation in which an employee briefly left Wal-Mart's employ and, upon her return, discovered a gap in her benefits despite numerous representations that her coverage had continued. Tegtmeier emphasizes that both in *Bowerman* and in the present case, neither the pension plans nor the summary plan descriptions explicitly addressed the particular fact situations at issue. However, this is where the similarities end. In *Bowerman*, the court noted that the summary plan description should have dealt with the situation because it was common enough to recur repeatedly and affect people

besides Bowerman. *Id.* at 590-91 ("In this case, the informa-
tion the Plan should have provided to Ms. Bowerman
would not have been information unique to her situation;
rather, the information she needed would have been
information relevant to all Plan participants who were
rehired by Wal-Mart within a few weeks or months after
leaving the company."). This is not our situation. Instead of
demonstrating that a gap in the Pension Plan existed,
Tegtmeier *created* a gap by fashioning a benefit unique to his
circumstances and trying to impose it on the Pension Plan.
There was no need for either the Pension Plan or the
Summary Plan Description to deal with a "hold" situation
because it did not exist before Tegtmeier and was exclusive
to him. As the district court recognized, this would be a
very unique situation in which one would apply for perm-
anent disability benefits before knowing whether the disability
was permanent. Tegtmeier's reliance on *Bowerman* is mis-
placed.[4]

### III.

Tegtmeier attempted to maximize his benefits under the
two plans and miscalculated the effects of his moves. While
the result was unfortunate, we cannot say that the Pension
Fund acted arbitrarily and capriciously or breached its
fiduciary duties when processing Tegtmeier's claim.

AFFIRMED.

---

[4] As Tegtmeier has failed to succeed on any of his claims, we do
not reach his arguments regarding potential remedies.

A true Copy:

     Teste:

                     _____

                     *Clerk of the United States Court of*
                     *Appeals for the Seventh Circuit*