# In the
# United States Court of Appeals
## For the Seventh Circuit

—————

No. 05-2066

SYLVIA A. DOUGHERTY,

*Plaintiff-Appellant,*

*v.*

INDIANA BELL TELEPHONE COMPANY, AMERITECH
CORPORATION, a company of SBC, an Indiana
corporation for profit d/b/a SBC INDIANA,
SBC COMMUNICATIONS, INCORPORATED, an
Illinois corporation for profit, AMERITECH
PENSION PLAN, *et al.,*

*Defendants-Appellees.*

—————

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 03 C 186—**Sarah Evans Barker**, *Judge.*

—————

ARGUED DECEMBER 2, 2005—DECIDED MARCH 16, 2006

—————

Before BAUER, POSNER, and MANION, *Circuit Judges.*

MANION, *Circuit Judge.* The Indiana Bell Telephone
Company employed Sylvia Dougherty as a telephone
operator. During her employment, she participated in an
employer-sponsored disability plan providing sickness
benefits and accident benefits. Under this plan, accident
benefits are generally more desirable than sickness benefits.
After a disabling neck strain in 1988, the plan awarded

Dougherty accident benefits. The benefits continued until 2000 when the plan determined that Dougherty was no longer disabled. Dougherty returned to work but soon experienced pain in her right shoulder and elsewhere. This pain led her again to seek disability benefits. This time, the plan granted her sickness benefits, not accident benefits. Dougherty sued, challenging the plan's termination of accident benefits from her 1988 claim as well as the plan's classification of her subsequent benefits as sickness benefits. The district court granted the plan summary judgment. Dougherty appeals. We affirm.

## I.

### A.

Sylvia Dougherty began working at the Indiana Bell Telephone Company as a telephone operator in 1979. At times relevant to this action, Indiana Bell and its parents, first Ameritech Corporation and later SBC Communications, Inc., sponsored what is currently known as the Ameritech Sickness and Accident Disability Benefits Plan (the "plan"). Dougherty participated in the plan during her employment.

As is evident from its name, the plan administers two types of disability benefits. *See Sisto v. Ameritech Sickness & Accident Disability Benefit Plan*, 429 F.3d 698, 700-01 (7th Cir. 2005) (explaining the same plan). Sickness benefits cover disabilities caused by illnesses or injuries suffered outside the course of employment, and sickness benefits are capped at fifty-two weeks. Accident benefits, by contrast, are for disabling illnesses or injuries suffered during the course of employment. Unlike sickness benefits, there is no automatic time limitation. Accident benefits continue for the duration of the disability.

**B.**

In September 1987, Indiana Bell increased Dougherty's work week from five to six days. Dougherty responded by obtaining a doctor's note recommending that "she work only five days per week." The doctor justified the recommendation by stating that Dougherty had back and neck pain "related to work stress" and that her "problem is aggrevated [sic] by working more than five days in a row." To verify this medical complaint, Indiana Bell had Dougherty undergo a functional capacity evaluation in January 1988. The exam included lifting items weighing more than ten pounds. During the testing, Dougherty strained muscles in her neck. As a result, she then claimed that she was unable to work at all.

Dougherty then applied for disability benefits under the plan, and the plan agreed that she was disabled. Because the strain occurred during the functional capacity evaluation and because Indiana Bell directed Dougherty to participate in that evaluation, the injury occurred in the course of employment according to the terms of the plan. Consequently, the plan awarded Dougherty accident benefits. Separately, she received worker's compensation as a result of this neck strain.

Dougherty's accident benefits continued largely uninterrupted for the next twelve years. Although accident benefits only last as long as the disability lasts, the plan, for several years, did not monitor the status of Dougherty's disability. That changed in September 1999, when a claims representative reviewed Dougherty's file and discovered the absence of a recent medical evaluation. To avoid any malingering, the plan first checked Dougherty's status by hiring a private investigator. The investigator spoke with Dougherty's neighbors, who reported that Dougherty was very active

and exhibited no signs of obvious disability. While surveilling Dougherty's home, the investigator reported seeing Dougherty running outside to close a convertible roof due to a sudden rainstorm. Also, on a videotape, the investigator indisputably recorded Dougherty operating her vehicle and carrying several shopping bags out of a store to her vehicle. The tape possibly caught her performing yard work, but the identity of the woman on that portion of the tape is disputed.

The plan then had Norman Moskowitz, M.D., conduct a medical examination of Dougherty in January 2000. In evaluating Dougherty's cervical spine (neck), Dr. Moskowitz found that she had lost some ability to bend and extend her neck but noted no neurological deficits. He further observed that, when he had tested her range of motion, Dougherty "was not credible, cooperative or compliant." Besides his exam, Dr. Moskowitz reviewed her medical file and the investigator's surveillance report and tape. Dr. Moskowitz concluded that Dougherty was "not disabled from any type of employment." The plan then terminated her accident benefits as of January 30.

In response, Dougherty obtained a medical evaluation of her own dated February 25, 2000, which was performed by Roland Kaplan, D.O. Dr. Kaplan found that, among other problems, Dougherty had inflamed nerves in her cervical spine, and, although she had "good cervical motion," he found her cervical spine to be less than fully functional. Dr. Kaplan concluded that, with respect to work, Dougherty could not sit for more than ten minutes at a time and recommended maintaining the "status quo," i.e., not working and staying on disability leave. In March, Dougherty submitted Dr. Kaplan's report to the plan and appealed the termination of benefits. Thereafter, Dougherty

submitted additional reports from Dr. Kaplan, which essentially confirmed his earlier conclusions.

The plan then had David Trotter, M.D., review Dougherty's updated medical file. Dr. Trotter acknowledged that the file indicated some cervical spine trouble, but he believed, based upon the file, that those troubles were "associated with a significant amount of symptom magnification." He concluded that Dougherty was not disabled, stating that there was "no medical justification for any alteration" in the plan's determination that she was no longer disabled as of January 30. Dr. Trotter added that the plan was "quite liberal" in using that date because, in his opinion, it appeared that Dougherty could have returned to work "at a much earlier point in time." Dr. Trotter also reviewed Dr. Kaplan's supplemental reports, but Dr. Trotter's opinion did not change. The plan denied Dougherty's appeal on May 12 and informed her that its decision was final. Dougherty took no further action on this accident claim at that juncture.

## C.

Dougherty returned to work on June 12, worked about three weeks, and lodged a claim for disability benefits on July 7. This claim followed a July 3 visit with one of Dougherty's numerous doctors in this case. Among other findings, this doctor noted neck, wrist, and spinal problems as well as weakness in Dougherty's rotator cuff (shoulder).

As the 1988 claim was no longer active, the plan treated this claim as a new claim. In addition, the plan classified the claim as one for sickness benefits, not accident benefits. The plan did so because there was no work-related injury presented to the plan in conjunction with this claim. Fur-

ther, Dougherty did not submit the proper form for accident benefits (an "AM974 form") or some equivalent and did not instruct the plan to treat this claim as being related to her 1988 accident claim. Moreover, the plan immediately informed Dougherty that it was treating this claim as a sickness claim, which it plainly defined as a claim based upon an "off-the-job" injury. Dougherty took no action at that time to dispute the classification. The importance of these details will become apparent below. The plan awarded Dougherty sickness benefits for the period of July 8 to July 17.

Dougherty returned to work on July 18 but stopped working again on August 4 on account of continued pain. She again sought disability benefits, but, as before, she did not present an on-the-job injury as the basis for an accident claim or otherwise instruct the plan to link this claim to her 1988 claim. The plan treated this August claim as a relapse of the July sickness claim and so informed Dougherty. On August 10, Dougherty called the plan and asked why the claim was not being treated as an accident claim. A plan representative responded to Dougherty's inquiry by leaving her a cryptic voicemail along the lines of accident benefits being linked to worker's compensation, and the representative invited Dougherty to call back if Dougherty had additional questions. Dougherty did not pursue her inquiry further nor did she appeal or otherwise dispute the sickness versus accident classification at that time. In September, Dougherty underwent shoulder surgery and was treated for carpal tunnel syndrome. As to her August claim, Dougherty received sickness benefits from August 11 to December 16. The plan selected the end date after consulting with Dougherty's doctors. Dougherty did not appeal that decision nor any other aspect of this claim. She returned to work on December 18, 2000.

In March 2001, Dougherty ceased working, complaining of neck and upper back pain, and made another disability claim in a similar fashion as before. The plan again immediately informed her that the claim was being treated as a sickness claim, and she did not challenge that classification at the time. The plan denied the claim in April, citing a lack of documentation. Dougherty appealed the denial but not the sickness classification. After several rounds of medical evaluations, document submissions, and general back and forth between the parties, the plan reversed its denial and awarded Dougherty sickness benefits from March 18, 2001 to March 2, 2002.

Nevertheless, because sickness benefits, as discussed above, cannot exceed fifty-two weeks, the plan later determined that the March 2 date was erroneous; Dougherty exhausted her fifty-two weeks well before that date. Between Dougherty's July 2000 and August 2000 claims, she received approximately twenty weeks of benefits. Thus, she had roughly thirty-two weeks left for the March 2001 claim, and those weeks ran out on October 29, 2001. The plan reached this determination because the benefit periods associated with the three 2000 and 2001 claims were "successive periods of disability" under the terms of the plan, meaning that they had to be grouped together as one period for purposes of the fifty-two-week clock. Pursuant to the plan's text, a new clock starts to run only when the employee has been back to work for more than thirteen continuous weeks. Dougherty did not satisfy that requirement. The plan notified Dougherty of this correction in March 2002.

### D.

Dougherty took no further action until June 2002, when she—now represented by counsel—sent a letter to the plan

seeking to appeal the plan's denial of *accident* benefits, not sickness benefits. In August 2002, the plan advised Dougherty, through her counsel, that the plan terminated her *accident* benefits from the 1988 claim in January 2000, that she had already appealed that termination in March 2000, and that the plan had already issued its final decision in May 2000. Viewing the 1988 claim as being closed for more than two years, the plan rejected the June 2002 appeal, standing on its final determination from May 2000.

In January 2003, Dougherty filed a state court lawsuit challenging the plan's actions under Employee Retirement Income Security Act, specifically, 29 U.S.C. § 1132(a)(1)(B), solely claiming wrongful denials of benefits. The case was then removed based upon a federal question. Besides the plan, other entities related to plan were named as defendants in the action, but there is no need to detail them here. The plan and the other defendants moved for summary judgment. The central issues were the plan's January 2000 termination of accident benefits from the 1988 claim and the plan's classification of the 2000 and 2001 claims as sickness claims rather than accident claims. The district court granted the summary judgment motion, and Dougherty appeals.

## II.

We review the district court's grant of summary judgment de novo. *See Sisto*, 429 F.3d at 700. Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). On appeal, Dougherty puts forth a morass of disjointed argu-

ments that can be distilled down to three issues: the standard by which to review the plan's decisions, the plan's termination of accident benefits from the 1988 claim, and the plan's handling of the 2000 and 2001 claims.[1]

## A.

When the terms of an employee benefit plan afford the plan administrator broad discretion to interpret the plan and determine benefit eligibility, the administrator's benefit decisions are reviewed under the arbitrary-and-capricious standard. *See Sisto*, 429 F.3d at 700. In granting summary judgment, the district court applied this highly-deferential standard. Dougherty argues for less deferential review, but she does not dispute the plan's language. Rather, she argues that the plan was biased against her and, therefore, that the plan should be afforded no deference or very little deference. *See, e.g., Manny v. Cent. States, Se. & Sw. Areas Pension & Health & Welfare Funds*, 388 F.3d 241, 242-43 (7th Cir. 2004); *Mers v. Marriott Int'l Group Accidental Death & Dismemberment Plan*, 144 F.3d 1014, 1020 & n.1 (7th Cir. 1998). This is an uphill battle for Dougherty because the existence of potential bias, a potential conflict of interest, is not enough to dislodge our ordinary and most-deferential level of arbitrary-and-capricious review. *See Ruiz v. Cont'l Cas. Co.*, 400 F.3d 986, 991 n.1 (7th Cir. 2005); *Mers*, 144 F.3d at 1020; *see also Rud v. Liberty Life Assur. Co. of Boston*, ___

---

[1] Separately, the district court granted summary judgment on two additional matters: the plan's March 2002 termination of sickness benefits as of October 2001 and Dougherty's alleged loss of future pension benefits caused by the plan's adverse disability determinations. Dougherty has not pursued these claims on appeal.

F.3d ___, No. 04-3655, 2006 WL 399149, at *5-6 (7th Cir. Feb. 22, 2006) (claimant must "demonstrate the existence of a real and not merely notional conflict of interest"). We presume a plan is "acting neutrally unless a claimant shows by providing specific evidence of actual bias that there is a significant conflict." *Kobs v. United Wis. Ins. Co.*, 400 F.3d 1036, 1039 (7th Cir. 2005) (quoting *Mers*, 144 F.3d at 1020).

In an attempt to show actual bias, Dougherty relies on three documents from the voluminous record. First, she cites a 1993 internal memorandum reviewing her benefits file. This memo, Dougherty contends, shows that the plan was wrongfully trying to "get rid" of her, and she therefore reasons that the plan was biased against her. The memo raises the possibility of offering Dougherty a settlement to amicably close out her accident claim, which, at that juncture, had been running for five years. The memo contains a sinister one-liner: "Our Company would gain from her no longer being on the active payroll." However, in context, there is nothing sinister about this memo. The memo recommended offering Dougherty a lump sum so as to conserve assets over the long run for the benefit of all the plan's participants and beneficiaries. *See Ameritech Benefit Plan Comm. v. Commc'n Workers of Am.*, 220 F.3d 814, 825 (7th Cir. 2000); *Fagan v. Nat'l Stabilization Agreement of the Sheet Metal Indus. Trust Fund*, 60 F.3d 175, 180 (4th Cir. 1995). Lump sum settlements are authorized under the terms of the plan, and the recommendation was not an attempt to shortchange Dougherty. The memo explicitly expressed the belief that Dougherty would be receptive to the offer—possibly preferring a sizeable amount of cash up front rather than receiving small installments over many years. The recommendation, moreover, was not a decree forced upon Dougherty. Rather, the recommendation was to make an *offer* to see *if* she found the idea desirable. She

had the option to reject the offer. (It is unclear if the plan made this offer, but, if it did, it was unquestionably refused as the plan continued paying Dougherty benefits until 2000.) Furthermore, this memo was not drafted in a context of the plan having insufficient assets, which, if the case, might alter the analysis. *Cf. Hess v. Reg-Ellen Mach. Tool Corp.*, 423 F.3d 653, 659-60 (7th Cir. 2005) (actions taken in the face of insufficient assets gave "more teeth" to plaintiff's claim of bias). In sum, the plan's conduct here constitutes fair and responsible management of resources on behalf of all participants and beneficiaries. The memo does not show that the plan held some bias against Dougherty. This conclusion holds especially true here when some seven or more years lapsed between the time of this 1993 memo and the 2000 to 2002 disability decisions at issue in this appeal.

Second, Dougherty complains about a 1997 internal email concerning a mistaken stop in payments of her accident benefits. One agent of the plan sent an email to another agent to correct this erroneous stoppage and to pay her for all missed payments. Siding with Dougherty, the email referred to the stoppage as a "definite 'no-no' " and correctly stated that benefits continue for as long as the employee remains disabled. The email then suggested putting together a settlement offer. Dougherty takes issue with the mere existence of settlement talk in this context, arguing that any thought of settlement shows that the plan was biased against her. However, we again see no evidence of bias here. The email was intended for Dougherty's benefit. It promptly corrected a mistake in favor of Dougherty. As for the settlement reference, it follows the discussion in the preceding paragraph.

Third, Dougherty contends that internal staff notes concerning the decision to initiate an investigation of her disability status in 1999 exhibits bias. This is Dougherty's

weakest point. Since eligibility for accident benefits lasts only as long as the disability lasts, it was more than appropriate for the plan to contemplate checking up on a claimant's disability and then doing so. The plan had a duty to all of its beneficiaries and participants to investigate ongoing claims, such as Dougherty's, making sure to avoid paying benefits to claimants who were not entitled to receive them. *See Ameritech*, 220 F.3d at 825; *Barnhart v. UNUM Life Ins. Co. of Am.*, 179 F.3d 583, 589 (8th Cir. 1999) ("A company failing to conduct proper inquiries into claims for benefits breaches its duty to all claimants as a fiduciary of the benefit funds when it grants claims to unqualified claimants."); *cf. Gaither v. Aetna Life Ins. Co.*, 394 F.3d 792, 807 (10th Cir. 2004) ("fiduciary has a duty to protect the plan's assets against spurious claims"). Thus, contrary to Dougherty's contention in her brief, these notes do not evince some conspiracy to "get her off the payroll at all costs by any way possible." They simply reveal an entirely permissible internal decision-making process that led the plan to verify her continued eligibility. *See Robyns v. Reliance Standard Life Ins. Co.*, 130 F.3d 1231, 1237 (7th Cir. 1997). What is more, there is no indication that the agents behind the eligibility investigation had a personal stake in the outcome of Dougherty's claim. *See Leipzig v. AIG Life Ins. Co.*, 362 F.3d 406, 409 (7th Cir. 2004). On the contrary, these notes demonstrate that the agents were not looking out for themselves but prudently attending to the best interests of all participants and beneficiaries. *See Ameritech*, 220 F.3d at 825. At bottom, these notes and the decision to investigate Dougherty's disability status do not establish actual bias. Accordingly, Dougherty has not presented a sufficient reason to supplant the customary arbitrary-and-capricious standard with a less deferential level of review. *See Kobs*, 400 F.3d at 1039; *Ruiz,* 400 F.3d at 991 n.1.

Under this standard then, we will uphold a benefit decision so long as that decision has "rational support in the record." *Leipzig*, 362 F.3d at 409. " '[Q]uestions of judgment are left to the plan administrator,' and 'it is not our function to decide whether we would reach the same conclusion' as the administrator." *Sisto*, 429 F.3d at 701 (quoting *Trombetta v. Cragin Fed. Bank for Sav. Employee Stock Ownership Plan*, 102 F.3d 1435, 1438 (7th Cir. 1996); *Tegtmeier v. Midw. Operating Eng'rs Pension Trust Fund*, 390 F.3d 1040, 1045 (7th Cir. 2004)). Put simply, a decision will not be overturned unless it is "downright unreasonable." *Sisto*, 429 F.3d at 700 (quoting *Tegtmeier*, 390 F.3d at 1045).

## B.

With that, we turn to the plan's termination of accident benefits on Dougherty's 1988 claim. The plan's January 2000 decision to terminate benefits is supported by at least three items in the record. One, the reports from Dougherty's neighbors that she was very active and showed no signs of obvious injury. Two, the undisputed portion of the investigator's videotape showing Dougherty engaging in normal, everyday activities, i.e., driving her vehicle and hauling shopping bags. Three, the opinion of Dr. Moskowitz, who, beyond reviewing the file and the surveillance tape, examined Dougherty in person and concluded that she was "not disabled from any type of employment." Additionally, these three items plus a fourth item, Dr. Trotter's later opinion that Dougherty was not disabled, support the plan's May 2000 denial of her administrative appeal. The fact that Drs. Moskowitz and Trotter's views conflicted with those of Dougherty's doctor, Dr. Kaplan, does not change the result under the arbitrary-and-capricious standard. *See Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003);

*Leipzig*, 362 F.3d at 409 ("Most of the time, physicians accept at face value what patients tell them about their symptoms; but [plan administrators] must consider the possibility that applicants are exaggerating in an effort to win benefits (or are sincere hypochondriacs not at serious medical risk)."). Thus, there is more than sufficient rational support to uphold the plan's conclusion that Dougherty was no longer disabled and its corresponding decision to terminate benefits. *See Kobs*, 400 F.3d at 1040; *Leipzig*, 362 F.3d at 409.

In an attempt to show bad faith and bypass this rational support, *see Trombetta*, 102 F.3d at 1438, Dougherty complains of the plan's failure to provide her with the investigator's videotape during the administrative proceedings. The problem here is that, while she was aware of the tape during the administrative proceedings, she never submitted a request to the plan for the tape. Rather, she asked her union representative to retrieve the tape for her, and the union representatives who requested the tape from the plan did so without proper authorization. Putting aside the defective request, Dougherty suggests that common sense dictates that the plan should have simply released the tape to her and/or her union representative. Not so. Common sense counsels that a tape bearing information of a private and confidential nature should not be released without proper authorization. Had the plan simply released the tape under these circumstances it would have run afoul of its duty to "not to disclose private information without proper authorization." *Anderson v. Flexel, Inc.*, 47 F.3d 243, 249 (7th Cir. 1995) (internal quotation omitted). There were proper channels to obtain and then contest the tape, Dougherty did not avail herself of those channels. Her argument here does not merit reversal of the plan's decision.

Dougherty also calls attention her worker's compensation claim, specifically whether that claim was settled in 1993.

The district court mentioned that it was. Dougherty and the record indicate that it was not. (It was not closed until 2002.) Dougherty contends that this error merits reversal. However, whether the worker's compensation claim was settled has no bearing on the outcome of the case. It is a background matter, not a material fact. *See* Fed. R. Civ. P. 56(c). The material facts here concern whether the plan had rational support in the record to terminate her accident benefits. The pendency of the worker's compensation claim does not alter or impugn the evidence discussed two paragraphs above justifying the termination of benefits. Furthermore, even if, as Dougherty maintains, this misunderstanding somehow infected the district court's summary judgment decision, it is of no consequence. We review the district court's summary judgment decision de novo, and we can affirm a district court's judgment even if that correct judgment was reached by an erroneous means. *See Commonwealth Ins. Co. v. Titan Tire Corp.*, 398 F.3d 879, 887 (7th Cir. 2004). Bottom line, reviewing this case de novo (i.e., without the benefit of or in deference to the district court's opinion), we find rational support in the record for the plan's decision to terminate accident disability benefits. Therefore, under the arbitrary-and-capricious standard, we uphold the plan's decision.

## C.

Dougherty also challenges the plan's decision to classify the three claims initiated in 2000 and 2001 as sickness claims rather than accident claims. On this front, the district court concluded that Dougherty failed to exhaust her administrative remedies and further found that the two exceptions to the exhaustion requirement—lack of meaningful access to review and futility—did not apply. *See Stark v. PPM Am., Inc.*, 354 F.3d 666, 671 (7th Cir. 2004). We will not disturb a

district court's exhaustion decision unless "there has been a clear abuse of discretion." *Id.* (internal quotation omitted). "Exhaustion of plan remedies is favored because the plan's own review process may resolve a certain number of disputes; the facts and the administrator's interpretation of the plan may be clarified for the purposes of subsequent judicial review; and an exhaustion requirement encourages private resolution of internal employment disputes." *Id.* (internal quotation omitted). Failure to exhaust such remedies precludes judicial consideration of the underlying issue. *See id.* at 672.

As detailed in the background section above, during the administrative process of the July 2000, August 2000, and March 2001 disability claims, (1) Dougherty did not expressly present an on-the-job injury or link these claims to her 1988 accident claim; (2) the plan immediately notified her that each claim was being treated as a sickness claim; and (3) Dougherty did not appeal, dispute, or otherwise challenge the plan's sickness classification. The only time Dougherty even addressed the sickness versus accident classification was when she placed a single phone call to a claims representative asking *why* her claim had been classified as a sickness claim. Given her call, Dougherty clearly appreciated a difference between sickness and accident benefits, yet she did not tell the plan that she wanted her claim classified in a certain way or make a discernable effort to show that she disagreed with the classification. Further, when Dougherty's counsel sent the plan an appeal letter in June 2002, that letter solely referred to accident benefits. As such, that letter could not even be considered an appeal of the sickness classification in the 2000 and 2001 claims. The first articulated dispute to the classification came with the filing of Dougherty's lawsuit in 2003. Consequently, the plan did not have an opportunity

to review Dougherty's present classification dispute at the administrative level. Under these circumstances, we agree with the district court's exhaustion ruling.

Dougherty, nonetheless, does not attack this reasoning directly. Instead, she contends that the plan should be estopped from relying on the failure-to-exhaust defense. She argues that the voicemail (which tied accident benefits to worker's compensation instead of the plan's requirement of a disabling injury in the course of employment) caused her not to appeal the adverse classification. As the plan points out, however, Dougherty failed to make this argument to the district court. When confronted with the consequences of this failure, Dougherty suggests in her appellate reply brief that she did raise it and cites a single paragraph in an affidavit filed with her summary judgment response. Viewed generously, this affidavit hints at the foundation of a possible estoppel argument. Burying a potential argument in an affidavit supporting a response brief, and then only hinting at it, is wholly inadequate. *Cf. United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) (waiver when argument buried in a brief). To preserve this issue for appeal, Dougherty should have argued it in her response brief or otherwise explicitly called it to the district court's attention. Dougherty has therefore waived her estoppel argument. *See Trs. of the AFTRA Health Fund v. Biondi*, 303 F.3d 765, 776 n.9 (7th Cir. 2002). We add, furthermore, that such oral advice about a plan does not count for much when, as here, *see supra* Part I.A, the written text of the plan clearly sets out the difference between sickness and accident benefits. *See Librizzi v. Children's Mem'l Med. Ctr.*, 134 F.3d 1302, 1305 (7th Cir. 1998) ("Revealing the truth in writing usually precludes a claim based on a supposed oral error."). Estoppel, in circumstances such as these, "only applies to written, and not to oral, misrepresentations." *Gallegos v. Mt.*

*Sinai Med. Ctr.*, 210 F.3d 803, 809-10 (7th Cir. 2000); *see also Kamler v. H/N Telcomm. Servs., Inc.*, 305 F.3d 672, 679-81 (7th Cir. 2002). Accordingly, Dougherty's estoppel argument does not alter the exhaustion analysis.

Finally, Dougherty complains that she should not have been required to exhaust administrative remedies because the plan did not give her a written denial notice of accident benefits for her 2000 and 2001 claims and further because the plan did not make a reviewable factual determination to support these denials. It is true that claimants are entitled to adequate, written notice for denials of their claims. *See Urbania v. Cent. States, Se. & Sw. Areas Pension Fund*, 421 F.3d 580, 586 (7th Cir. 2005). Here, however, Dougherty did not expressly present an accident claim to the plan. Rather, the plan confronted claims that were not linked to any injury suffered during the course of employment. Not surprisingly then, given the plan's text, the plan classified the claims as sickness claims. Further, the plan promptly notified Dougherty of the classification and ultimately granted these claims. Therefore, with respect to Dougherty's now-desired, but then-unarticulated accident claims, the plan's denial-notice obligations were not triggered. We accordingly find no grounds to reverse the district court's exhaustion decision.

## III.

Given the discretionary terms of the plan, the correct standard to review the plan's benefit decisions is the arbitrary-and-capricious standard. There is, moreover, no evidence of bias that would necessitate a less deferential review. Furthermore, the plan's termination of accident benefits on Dougherty's 1988 claim has rational support in the record; thus, under the arbitrary-and-capricious stan-dard, we will not disturb that decision. Finally, Dougherty's

failure to exhaust administrative remedies bars consideration of her contention that the plan misclassified her 2000 and 2001 claims as sickness claims. The judgment of the district court is AFFIRMED.

A true Copy:

      Teste:

_____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*