# In the

# United States Court of Appeals

## For the Seventh Circuit

No. 10-1448

AUDREY Y. SELLERS,

*Plaintiff-Appellant,*

*v.*

ZURICH AMERICAN INSURANCE COMPANY,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 08 C 224—**Lynn Adelman**, *Judge.*

ARGUED SEPTEMBER 30, 2010—DECIDED DECEMBER 3, 2010

Before FLAUM, MANION, and TINDER, *Circuit Judges.*

FLAUM, *Circuit Judge.* On November 16, 2006, Anthony Sellers had surgery to remove a broken wire from his knee. Tragically, Mr. Sellers died nine days later from an acute pulmonary embolism with infarct, caused by his immobilization following the operation. The wire that necessitated the November 16 surgery had been inserted over a year earlier during a previous

operation to repair Mr. Sellers's patella tendon, which he tore while performing training exercises at work.

At issue in this case, which arises under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 *et seq.*, is whether Mr. Sellers's death is covered by the accidental death and dismemberment ("AD&D") insurance policy in his employer's employee welfare benefit plan. The AD&D policy covers accidental deaths occurring within 365 days of the accident. Thus, the question before us is whether Mr. Sellers's death can be traced to an accident that occurred within a year of his death. Zurich American Insurance Company, which issued the AD&D policy, concluded that it could not, and the district court deferred to that determination.

For the following reasons, we affirm the district court's judgment.

## I. Background

Mr. Sellers worked at Time Warner Cable Company and participated in Time Warner's ERISA-governed employee welfare benefit plan, which included an AD&D policy. On September 15, 2005, Mr. Sellers tore a tendon in his knee while performing training exercises at work. Mr. Sellers underwent surgery to repair the torn tendon on September 29, 2005. His surgeon, Dr. Rosemary Schultz, inserted a metal wire in Mr. Sellers's knee to assist in the healing process. Prior to the surgery, Dr. Schultz explained that she likely would remove the wire four to six months after surgery.

On April 3, 2006, Mr. Sellers saw Dr. Schultz for a follow-up appointment. Because Mr. Sellers was not having any knee pain at that time, Dr. Schultz decided not to remove the wire until symptoms occurred. Mr. Sellers saw Dr. Schultz for another office visit later that spring, at which time he complained that his knee was swelling. Dr. Schultz recommended that Mr. Sellers undergo surgery to remove the wire after x-rays revealed that it had broken into three pieces. On November 16, 2006, Mr. Sellers had surgery to remove the broken wire. Dr. Schultz's surgical notes stated that the fact that the wire had broken was, "in many degrees, . . . expected." Nine days later, on November 25, 2006, Mr. Sellers died from what an autopsy determined to be acute pulmonary embolism with infarct, due to immobilization following the wire removal.

In March of 2007, Audrey Sellers, Mr. Sellers's widow, submitted a claim for benefits under the AD&D policy to Zurich, the Plan administrator. The accidental death provisions of the policy provide that benefits are due "[i]f injury to a Covered Person results in Loss of Life . . . within 365 days of the accident." The policy defines "injury" as "an accidental bodily injury which is a direct result, independent of all other causes of a hazard set forth in the 'Description of Hazards.'" The policy does not define "accident," or "accidental." Instead, it grants Zurich "discretionary authority to determine eligibility for benefits and to construe the terms of the plan." Expressly excluded from coverage under the policy are deaths caused by "illness[,] . . . sickness, disease, bodily infirmity or medical or surgical treatment

thereof, or bacterial or viral infection, regardless of how contracted."

Zurich denied Mrs. Sellers's claim. To the extent that Mr. Sellers's death could be traced to the September 15, 2005 knee injury, Zurich concluded that Mrs. Sellers was not entitled to benefits because the accident occurred more than 365 days before Mr. Sellers's death. Zurich rejected Mrs. Sellers's position that the wire breakage constituted an "accidental bodily injury," reasoning that such medical device failures are not accidents under the policy.

After exhausting her internal appeals, Mrs. Sellers brought suit against Zurich under ERISA, 29 U.S.C. § 1132(a)(1)(B), to recover death benefits. The parties filed cross-motions for summary judgment. The district court found that Zurich had failed to support its conclusion that the break in the wire was not an accident under the policy with adequate findings and reasoning. For that reason, the district court remanded the case to Zurich for a new determination of Mrs. Sellers's claim.

Upon reconsideration, Zurich again denied Mrs. Sellers's claim, concluding that the wire breakage was not an accidental injury under the policy. In reaching that conclusion, Zurich defined the term "accident" as an "unexpected event[ ] of a fortuitous nature." Relying on the statement in Dr. Schultz's notes that "the wire has broken, which in many degrees, is expected," Zurich concluded the wire breakage could not be considered accidental because it was expected. Mrs. Sellers appealed, relying, in part, on our decision in *Senkier v.*

*Hartford Life & Acc. Ins. Co.*, 948 F.2d 1050 (7th Cir. 1991). Mrs. Sellers argued that, under *Senkier*, if a patient dies as a result of surgery that is necessitated by an accident, their death is accidental. Mrs. Sellers contended that Mr. Sellers underwent the November 2006 surgery because of the wire break—which she argued was an accident—and thus his death should be deemed accidental. Zurich responded by maintaining that the wire break was not an accident.

After Zurich's second denial of Mrs. Sellers's claim, the parties again filed cross-motions for summary judgment in the district court. In an order dated February 19, 2010, the district court granted Zurich's motion for summary judgment. Applying an arbitrary and capricious standard of review, the district court concluded that Zurich's decision denying Mrs. Sellers a benefit because the wire break was expected was reasonable. Mrs. Sellers timely appealed.

## II. Discussion

We review a district court's decision on cross-motions for summary judgment without deference, construing all inferences in favor of the party against whom the motion under consideration is made. *Tegtmeier v. Midwest Operating Eng'rs Pension Trust Fund*, 390 F.3d 1040, 1045 (7th Cir. 2004). Summary judgment is proper when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 255 (1986).

In the context of a denial of benefits under ERISA, the proper standard of review turns on two factors: (1) whether the plan gives the plan administrator discretion to construe policy terms, and (2) the basis for the decision to deny coverage. Where the plan gives the plan administrator discretion to construe policy terms, and the decision to deny coverage is based on an interpretation of the plan, we apply an arbitrary and capricious standard of review. *See Hess v. Reg-Ellen Machine Tool Corp.*, 423 F.3d 653, 658 (7th Cir. 2005). Where either the plan grants no such discretion, or the denial of benefits determination is based on an interpretation of law, we apply a de novo standard of review. *See id.; Meyer v. Duluth Bldg. Trades Welfare Fund*, 299 F.3d 686, 689 (8th Cir. 2002) ("where a plan's decision to deny benefits is based on its construction of existing law, the plan's interpretation of a controlling principle of law is reviewed *de novo*"); *Penn v. Howe-Baker Engrs., Inc.*, 898 F.2d 1096, 1100 (5th Cir. 1990) ("in contrast to the great deference we grant the Committee's interpretations of the Plan, which involve contract interpretation, we accord no deference to the Committee's conclusions as to the controlling law, which involve statutory interpretation").

It is undisputed that the Plan gives Zurich discretion to construe policy terms and to determine eligibility for benefits. Therefore, the proper standard of review depends on the basis for Zurich's denial of Mrs. Sellers's claim. As noted above, Zurich based its denial of benefits decision on its construction of the Plan term "accident." That justification is subject to review under an arbitrary

and capricious standard. In denying Mrs. Sellers's claim, Zurich also rejected her position that *Senkier* compelled the conclusion that Mr. Sellers's death was accidental. We review Zurich's reading of *Senkier* de novo.

We begin with Zurich's conclusion that the wire break was not an accident under the policy because Mr. Sellers's doctor expected it to occur. The question before us is whether Zurich's interpretation of the term "accident," as used in the Plan, has "rational support in the record." *Davis v. Unum Life Ins. Co. of Am.*, 444 F.3d 569, 576 (7th Cir. 2006). Because the Plan is governed by ERISA, federal common law principles of contract interpretation apply. *Swaback v. American Information Technologies Corp.*, 103 F.3d 535, 540 (7th Cir. 1996). Those principles require that Plan terms be interpreted in "an ordinary and popular sense, as [they] would [be understood by] a person of average intelligence and experience." *Cannon v. Wittek Co. Intern.*, 60 F.3d 1282, 1284 (7th Cir. 1995). Consistent with that rule, we have stated that the construction of the term "accident" should be left to "common understanding as revealed in common speech." *Senkier*, 948 F.2d at 1052. *See also Cozzie v. Metropolitan Life Ins. Co.*, 140 F.3d 1104, 1110 (7th Cir. 1998) (a result is accidental where "the insured did not believe that the result would occur," and that "estimation can be considered reasonable") (citing *Wickman v. Northwestern Nat'l Ins. Co.*, 908 F.2d 1077, 1088 (1st Cir. 1990)); *Santaella v. Metropolitan Life Ins. Co.*, 123 F.3d 456, 462-63 (7th Cir. 1997) (in determining whether a certain result is accidental—meaning unexpected or uninten-

tional—we consider the result from the point of view of a reasonable person in the insured's position).

In light of these principles, we conclude that Zurich's decision that the wire break was not an accident because it was expected was not reasonable. Zurich interpreted the term "accident" as an event that Dr. Schultz, a medical professional, would consider to be "unexpected" or "fortuitous." Zurich's construction of "accident" as "unexpected" is not the problem; we have found comparable interpretations to be reasonable. *See Cozzie*, 140 F.3d at 1109 (finding insurer's interpretation of the term "accident" as an event that is not "reasonably foreseeable" to be reasonable). It is Zurich's application of that definition—from the point of view of a doctor, rather than "a person of average intelligence and experience" in Mr. Sellers's shoes—that was arbitrary. *See Senkier*, 948 F.2d at 1054 (the proper inquiry is whether "the average person would say that the decedent had died in an accident" or not). By failing to interpret the Plan as would a person of average intelligence and experience, Zurich acted arbitrarily and capriciously. *See Swaback*, 103 F.3d at 540-42 (finding that ERISA plan administrator acted arbitrarily and capriciously where it deviated from the plan language as it would be understood by a person of average intelligence and experience); *Dabertin v. HCR Manor Care, Inc.*, 373 F.3d 822, 829 (7th Cir. 2004) (ERISA plan administrator's definition of plan term "defied common sense and was not in accord with the ordinary and popular meaning of the term, and therefore was arbitrary and capricious").

Unfortunately for Mrs. Sellers's position, we neverthe-
less are compelled to affirm by our holding in *Senkier*.
Zurich argues that the wire breakage was a complication
of the original knee surgery, and thus, under *Senkier*,
cannot be deemed an accident.[1] In *Senkier*, the insured
was admitted to the hospital because of complications
associated with Crohn's disease. 948 F.2d at 1051. "A
catheter was inserted in a vein beneath [the insured's]

---

[1] In denying Mrs. Sellers's claim, Zurich both relied on *Senkier*
and concluded that the wire breakage was not an accidental
injury because it was an expected complication of medical
treatment. However, it is not clear that Zurich previously
linked the two, arguing, as it does now, that the wire breakage
was not an accident because it was an injury due to medical
treatment, which cannot be an accident under *Senkier*. To the
extent that Zurich is raising this argument for the first time,
we nevertheless will address it. "The matter of what questions
may be taken up and resolved for the first time on appeal is
one left primarily to the discretion of the courts of appeals, to
be exercised on the facts of individual cases." *Singleton v. Wulff*,
428 U.S. 106, 121 (1976); *see also Sprosty v. Buchler*, 79 F.3d
635, 645-46 (7th Cir. 1996). We conclude that entertaining
Zurich's argument is appropriate for a number of reasons.
First, Mrs. Sellers has relied on *Senkier* throughout this case,
including in her opening brief on appeal. Therefore, that *Senkier*
would be an issue before this Court comes as no surprise.
Second, the issue has been fully briefed, as Mrs. Sellers had
an opportunity to address Zurich's interpretation of *Senkier*
in her reply brief. Third, because we are reviewing the issue
de novo, it is irrelevant that we have no district court or Plan
administrator decision to which to defer.

clavicle for the purpose of administering nourishment intravenously," which is a standard treatment for Crohn's. *Id.* The insured died when the catheter became detached and punctured her heart, an occurrence that is considered a standard complication of the treatment. *Id.* at 1051, 1053. We concluded that the insured's death was not covered by her ERISA-governed AD&D policy, holding that "a policy of accident insurance does not reach . . . injuries resulting from medical treatment." *Id.* at 1051. Noting that any medical procedure involves "a risk that the procedure will inflict an injury," we reasoned that while that such "injuries are accidental in the sense of unintended and infrequent[,] . . . they are not 'accidents' as the term is used in insurance policies for accidental injuries." 948 F.2d at 1051-52. Rather, where an individual dies as a result of "standard complications of [a] standard medical treatment[ ]" for an illness, their death is the result of the underlying illness for which they were receiving treatment. *Id.* at 1053.

Both parties contend that, under *Senkier*, where an individual dies because of complications associated with medical treatment for an accident, that accident is the cause of death. We agree. The reasoning set forth in *Senkier* applies equally regardless of whether an individual is being treated for an accident or an illness when a medical mishap leads to injury or death. In either case, the cause of the injury or death is the underlying reason for the treatment.

The parties' dispute centers on whether the wire break, assuming for the moment that it was the under-

lying reason for Mr. Sellers's November 2006 surgery, constituted an accidental bodily injury. Mrs. Sellers contends that it did. While we are sympathetic to Mrs. Sellers's attempt to avoid the harsh impact of the policy's 365-day bar, *Senkier* requires us to disagree. That the wire might break was a risk associated with the original operation, as evidenced by the fact that Dr. Schultz expected it to break.[2] Therefore, to the extent that the breaking of the wire was an injury, it was a result of the first surgery. Under *Senkier*, such "injuries resulting from medical treatment" are not accidents as that term is used in AD&D policies. 948 F.2d at 1051-52. Because the wire break is exactly the type of complication we discussed in *Senkier*, it cannot be characterized as an accident.

The discussion above indicates that, to the extent that Mr. Sellers's death can be traced to any accidental injury, it is to the September 2005 injury. However, because that injury predated his death by more than 365 days, Mrs. Sellers is not entitled to benefits under the AD&D policy.

---

[2] Mrs. Sellers argues that the wire break should not be considered a complication of the original injury, because, by the time the wire broke, Mr. Sellers's knee had fully healed and the wire no longer was treating that injury. But the wire would not have been implanted in Mr. Sellers's knee *but for* the September 2005 accidental knee injury. Therefore, the wire breaking—and the ensuing second surgery—cannot logically be separated from the initial operation.

### III.  Conclusion

For the foregoing reasons, we AFFIRM the district court's judgment.