In the

# United States Court of Appeals
### For the Seventh Circuit

No. 04-2741

IRA SHYMAN,

*Plaintiff-Appellant,*

*v.*

UNUM LIFE INSURANCE CO.,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 01 C 7366—**Joan B. Gottschall**, *Judge.*

ARGUED SEPTEMBER 22, 2005—DECIDED OCTOBER 21, 2005

Before EASTERBROOK, EVANS, and SYKES, *Circuit Judges.*

EASTERBROOK, *Circuit Judge.* Shatkin, Arbor, Karlov &
Co., a commodities-trading firm, arranged disability
benefits for its employees and affiliated traders. Ira
Shyman trades soybean contracts on the Chicago Board of
Trade and clears his transactions through Shatkin Arbor.
Shyman has suffered from headaches much of his life, and
in 1999 he applied for disability benefits, telling Unum Life
Insurance, the plan's insurer (and administrator) that the
condition had worsened and prevented him from working as
much as he used to. The plan provides benefits when

trading income falls below 80% of a three-month rolling average, and Unum concluded that this condition had been satisfied for some months in 1999 but not others. When Shyman filed a new application in 2000, however, Unum denied it outright, stating that Shyman lacked credible medical evidence of a disabling condition. Invoking Illinois insurance and tort law, Shyman sued in federal court; the judge held, however, that ERISA (the Employee Retirement Income Security Act) preempts state law and that Unum's decision with respect to the 2000 application is neither arbitrary nor capricious. 2004 U.S. Dist. LEXIS 4964 (N.D. Ill. Mar. 24, 2004).

Shyman's principal argument in the district court, and his lead contention on appeal, had been that ERISA never applies to independent contractors. According to Shyman it deals only with employees ("participants" in the statutory argot) and people whose interests derive from them ("beneficiaries"). While Shyman's appeal was pending, however, we held in *Ruttenberg v. United States Life Insurance Co.*, 413 F.3d 652 (7th Cir. 2005), that independent contractors can be "beneficiaries" of ERISA plans. In *Ruttenberg* the beneficiary was a floor trader who cleared trades through a commodities dealer that sponsored a welfare plan, in which the trader enrolled; Shyman's situation is indistinguishable.

This brings to the fore Shyman's fallback position that the disability coverage that Shatkin Arbor arranged for its staff and affiliated traders is not an ERISA welfare-benefit plan in the first place. Although the statute defines covered welfare plans to include all employer-sponsored disability-benefit programs, see 29 U.S.C. §§ 1002(1)(A), 1003(a), there is a regulatory exception for pure insurance products from third parties:

> For purposes of title I of the Act and this chapter, the terms "employee welfare benefit plan" and "welfare plan" shall not include a group or group-

type insurance program offered by an insurer to employees or members of an employee organization, under which

> (1) No contributions are made by an employer or employee organization;

> (2) Participation the program is completely voluntary for employees or members;

> (3) The sole functions of the employer or employee organization with respect to the program are, without endorsing the program, to permit the insurer to publicize the program to employees or members, to collect premiums through payroll deductions or dues checkoffs and to remit them to the insurer; and

> (4) The employer or employee organization receives no consideration in the form of cash or otherwise in connection with the program, other than reasonable compensation, excluding any profit, for administrative services actually rendered in connection with payroll deductions or dues checkoffs.

29 C.F.R. §2510.3-1(j). Shyman maintains that his disability coverage fits this exception: he paid all premiums, his decision to enroll was voluntary, and Shatkin Arbor did no more than permit Unum to publicize the program, neither endorsing it nor accepting consideration for its assistance.

This argument fails at the first step, so we need not consider the others. Shatkin Arbor paid part of the program's cost for its employees. Shyman concedes this but observes, yet again, that he was not an employee; *he* paid full freight even if those on the firm's payroll did not. He maintains, in other words, that a given package of benefits

is in or out of ERISA's scope person by person, rather than plan by plan. That's just a variant of the argument rejected in *Ruttenberg*, and it has no footing in either the statute or the regulation. ERISA speaks of welfare-benefit *plans*; the statute imposes duties on plan fiduciaries and plan administrators. Likewise the regulation speaks of a "plan" or "program" that is outside the statutory definition of a welfare-benefit plan. Unum offered and Shatkin Arbor sponsored a group plan, which would come into force only if 75% or more of eligible persons enrolled; there was no individual insurance policy. If a "plan" is covered, then every participant and beneficiary receives ERISA'S benefits (or detriments, which is how Shyman sees the absence of remedies such as punitive damages in tort).

The district judge concluded that the appropriate standard of review is deferential: she asked whether Unum's decision was arbitrary and capricious given the evidence in the administrative record. See *Perlman v. Swiss Bank Corp.*, 195 F.3d 975 (7th Cir. 1999). Unum and Shatkin Arbor agreed that "[w]hen making a benefit determination under the Policy, UNUM has discretionary authority to determine your eligibility for benefits and to interpret the terms and conditions of this Policy." No more is needed to give the plan administrator discretion and limit the scope of judicial review. See *Diaz v. Prudential Insurance Co.*, No. 04-2342 (7th Cir. Sept. 20, 2005); *Herzberger v. Standard Insurance Co.*, 205 F.3d 327 (7th Cir. 2000).

Shyman insists that this language does not count because it appears only in the certificate of insurance rather than in the body of the policy. *Ruttenberg* held that a proviso missing from the plan, the summary plan description, and the policy of insurance could not be deemed a grant of discretion in interpretation or application. But this package of documents declares that the certificate of insurance is *part* of the policy, unless it contradicts some other clause—and Shyman does not contend that the discretion-

granting language contradicts either the summary plan description or any clause of any other document. It is unimportant that one document is captioned "certificate" and another bears the legend "policy;" if the discretion-granting language can be on any page of a multi-page plan (and it can), then the fact that this page bears its own caption is irrelevant. Shyman does not contend that a beneficiary who inquired (or looked for himself) would not have discovered the discretion-granting language. A clause that not only represents the plan sponsor's decision but also communicates the rules to the participants and beneficiaries is enforceable under ERISA.

Plenary review is necessary, despite the terms of the plan, Shyman maintains, because Unum has a financial interest in denying claims. The law of this circuit is otherwise. See *Perlman* and, e.g., *Hess v. Reg-Ellen Machine Tool Corp.*, No. 04-3408 (7th Cir. Sept. 6, 2005); *Leipzig v. AIG Life Insurance Co.*, 362 F.3d 406 (7th Cir. 2004). Unum is much too large to be affected by its resolution of any one benefits claim. Anyway, actual contractual language supersedes arguments about what would be "good policy" for employers and those covered by welfare plans. Shyman might as well argue that Shatkin Arbor's plan ought to kick in when income drops below 85% of the rolling average rather than the 80% trigger in the plan. More judicial review might or might not be a boon to participants and beneficiaries, but how much of this boon to supply is a decision fundamentally no different from which financial benefits to provide. (This observation is commonplace in the law of arbitration. Contracts regularly provide for less-expensive dispute resolution so that savings can be put to other uses, such as reducing the cost of products covered by arbitration clauses.)

This brings us to the question whether Unum's decision was arbitrary or capricious. Shyman supported his claim with his statement that the headaches (including occasional

migraines) are severe and proof that his earnings had declined in many months, plus several reports from Lawrence Robbins, a neurologist specializing in headaches. Robbins told Unum that Shyman's headaches are so frequent and debilitating that he can not "stand and concentrate and think for more than a few minutes at a time." Dr. Robbins concluded that "he could [not] be a trader at his current capacity" and "can [not] function in any capacity in this way." Robbins stated in another report that Shyman is bedridden with pain from headaches and is completely unable to work.

Unum thought this peculiar, because Shyman continued to trade soybean contracts (both on the floor at the Board of Trade and electronically from his home). In June and July 1999, after Dr. Robbins had deemed Shyman unable to work, he earned net profits of $600,000 from floor trading. Trading in other months was less profitable, but the fact that Shyman continued to make a substantial income from an activity that Dr. Robbins had declared impossible raised doubts about the adequacy (or honesty) of Robbins's evaluation. Unum sent the file to another specialist, who deemed the Robbins assessments overstated and undersupported. Positron-emission tomography (a PET scan) often can verify or refute claims of incapacitating headaches; Robbins either had not performed such a test or had not reported its results, which Unum's consultant thought unusual under the circumstances. Suspicions raised, Unum hired a private detective, who watched Shyman coach basketball and baseball, exercise on a treadmill, drive his children to and from school, shop, tutor children as a volunteer at school, surf the Internet watching market activity, and trade commodities—all unexpected activities for someone supposedly bedridden and unable to concentrate for more than a few minutes at a time.

Shyman may well be honest and disabled in the policy's sense—that is, suffering a 20% or greater reduction in

income as a result of a medical condition. He loses more from a reduction in trading profits than he stands to gain from disability benefits, which are capped at $10,000 a month. Perhaps the problem lies in Dr. Robbins's overstatements. But Shyman did not supply Unum with any other medical evaluation. On the evidence in the administrative record, Unum did not act arbitrarily or capriciously in concluding that Shyman is more likely suffering from the burnout so common to floor traders than from a deteriorating medical condition.

AFFIRMED

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*