In the

# United States Court of Appeals

### For the Seventh Circuit

———————

No. 06-4127

BRENDA MOTE,

*Plaintiff-Appellant*,

*v.*

AETNA LIFE INSURANCE COMPANY and
ARTHUR ANDERSEN LLP GROUP LONG TERM
DISABILITY INSURANCE PLAN,

*Defendants-Appellees.*

———————

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 05 C 6212—**Milton I. Shadur**, *Judge.*

———————

ARGUED JUNE 5, 2007—DECIDED SEPTEMBER 12, 2007

———————

Before EASTERBOOK, *Chief Judge*, and MANION and WOOD,
*Circuit Judges.*

MANION, *Circuit Judge.*  Brenda Mote sued Aetna Life
Insurance Co. ("Aetna") and the Arthur Andersen Long-
Term Disability Plan (the "Plan") under the Employment
Retirement Income Security Act ("ERISA"), 29 U.S.C.
§ 1001 et seq., alleging that Aetna and the Plan arbitrarily
and capriciously terminated her disability benefit pay-
ments and that they should be estopped from terminating
her disability benefits because the Social Security Adminis-

tration found her "disabled" under its regulations. The district court dismissed Mote's claims against Aetna upon finding that Aetna was not a proper party to the action, denied Mote's motion for summary judgment against the Plan, and granted summary judgment to the Plan on all of Mote's claims against it. Mote appeals. We affirm.

## I.

Brenda Mote was a human resource generalist with Arthur Andersen LLP until she ceased working on April 10, 1998, due to back pain and physical complications, including fibromyalgia,[1] stemming from an August 1997 accident. On the day that Mote stopped working for Arthur Andersen, she applied for long-term disability benefits under the Plan, which was administered by Aetna. The Plan states that for purposes of ERISA, Aetna shall act as the Plan's fiduciary and be vested with "discretionary authority" both to "determine whether and to what extent employees and beneficiaries are entitled to benefits; and construe any disputed or doubtful terms of this policy." Specifically, Mote applied for long-term disability benefits under the Plan's "own occupation" definition of disability. That provision states that an employee is "totally disabled" if the insured employee is unable "[d]uring the first 5 years of disability to perform the material duties of the employee's own occupation." The Plan approved Mote's application, and on July 10, 1998, she began receiving long-term disability benefits. Following the Plan's

---

[1]  Fibromyalgia is "pain and stiffness in the muscles and joints that is either diffuse or has multiple trigger points." Dorland's Illustrated Medical Dictionary 673 (29th ed. 2000).

approval of her application, Mote continued to receive medical care for her back pain and fibromyalgia, and the Plan periodically reassessed her condition to ensure that she remained eligible for long-term disability benefits.

After Mote had been receiving long-term disability benefits for five years, on December 8, 2003, the Plan notified her that it recently had reevaluated her claim under its stricter, five-year definition of "totally disabled" and determined that she no longer qualified for long-term disability benefits. Under the Plan, while an employee only needs to demonstrate that he is unable to "perform the material duties of [his] *own* occupation" during the first five years of his disability, after five years the employee must demonstrate that he is unable to "work at *any* occupation for which [he] is, or may reasonably become, fitted by education, training or experience." In its letter to Mote, the Plan stated that it reached its decision after reviewing the office notes of Mote's treating physicians, various lumbar MRIs, CT scans, and surgical procedures, as well as statements by Mote's physicians regarding her physical limitations and restrictions. The letter also informed Mote that the Plan had hired an independent investigator who, in January 2003, videotaped her engaging in activities that she stated on her April 30, 2003, Claim Questionnaire that she was unable to perform. The Plan's letter further stated that it based its decision on the results of Mote's November 11, 2002, functional capacity examination and her September 15, 2003, independent medical examination, both of which found that Mote was capable of performing sedentary work. The letter also noted that the Plan's consulting physicians reviewed Mote's medical information on two recent occasions and reached the same conclusion.

Mote requested that the Plan review its decision. In support of her request for review, Mote submitted additional medical evidence from her treating physicians, including her primary care physician, Terry West, M.D., and her pain management specialist, James Gruft, M.D. Dr. West opined that Mote was suffering from a "class 5" physical impairment, which rendered her "incapable of minimal (sedentary) activity." He further noted that, in his opinion, "maximum medical improvement has [been] achieved. I don't believe she can ever work again." In a letter dated August 10, 2004, Dr. West stated that Mote suffers from fibromyalgia and chronic back pain, which remain unchanged, and he concluded that Mote "is still unable to work at this time, due to limitations of motion and need for sedating pain medication." Dr. Gruft also opined that Mote was incapable of sedentary activity, and that he believed that Mote's condition had "retrogressed."

Upon its receipt of Mote's additional information, the Plan informed Mote that it referred her file for an independent medical review. The Plan retained William Hall, M.D., to conduct its review. In his September 2, 2004, report, Dr. Hall stated that he reviewed Mote's medical history and opined:

> I must conclude that the weight of the medical credibility be given to the opinions of [Mote's] treating physicians and that, absent medical or personal information regarding [Mote] to the contrary, her subjective musculoskeletal symptoms are of such severity to be totally medically limiting.

However, during his initial review of Mote's medical records, Dr. Hall was unaware of the videotaped evidence of Mote's daily activities that the Plan obtained from its

independent investigator. The independent investigator recorded the videotapes between January 29, 2003, and February 4, 2003. Dr. Hall subsequently viewed selected portions of the videotapes, which showed Mote running errands, driving an elderly relative to doctors' appointments, and loading groceries into her car. Upon reviewing the videotape evidence of Mote's functional abilities, Dr. Hall changed his opinion regarding Mote's level of disability, stating:

> After viewing surveillance videos of [Mote's] activities for the dates and durations noted, I do not agree with assessments of severity or with medically limiting conclusions by [Mote's] treating physicians. I am not able to identify an objective or absolute impediment to [Mote] pursuing sustained and otherwise unrestricted activities at a light level of exertion.

In a letter dated September 28, 2004, the Plan notified Mote that, after a "full and fair review of the decision to terminate [her] claim," it was upholding its decision to terminate her long-term disability benefits.[2] The Plan's

---

[2] The Plan's letter of December 8, 2003, indicates that it based its decision to terminate Mote's benefits on the Plan's stricter, five-year definition of "totally disabled." Specifically, that letter states: "Our review of the information in our file indicates you have the functional capacity to perform the material duties *of any occupation* and you no longer meet the plan requirements for total disability." The Plan's letter of September 28, 2004, indicates that the Plan is "upholding [its] termination on December 8, 2003," and it cites both the initial and five-year definitions of "totally disabled." However, the Plan's second letter then states that Mote's long-term benefits "ceased on

(continued...)

letter cited a long list of materials that it reviewed in reaching its decision, and stated that "the weight of the medical information does not support a condition of total disability."[3] Mote then filed suit against both the Plan and

---

[2] (...continued)
December 8, 2003, after it was assessed you are capable of performing *your own sedentary occupation*." The Plan argues that the reference to Mote's own occupation in the second letter was a scrivener's error, and that Mote was apprised adequately of and able to respond to the stricter five-year definition set forth in the first termination letter. We agree that the Plan's letter of December 8, 2003, adequately notified Mote that the Plan's termination of her benefits—which occurred exactly five years after it originally approved her claim—was based on the five-year definition, and provided Mote with an opportunity to submit additional evidence challenging the Plan's decision under that definition of "totally disabled." The fact that the Plan erroneously cited the wrong definition of "total disability" in its final denial letter was inconsequential because that letter merely informed Mote that the Plan had affirmed its decision to deny her claim following its review of its earlier decision, which the parties do not dispute was based on the five-year definition. Accordingly, the Plan's scrivener's error in the second letter does not warrant remand to the plan administrator. *See Schleibaum v. Kmart Corp.*, 153 F.3d 496, 503 (7th Cir. 1998).

[3] The dissent asserts that the Plan's letter to Mote of September 28, 2004, adds entirely new language to the Plan. The "entire new language" that it quotes is a sentence lifted from a three-page letter explaining, after an "independent, full and fair review," why the Plan is upholding its decision to terminate Mote's claim for long-term disability benefits. The language that the dissent quotes is not an addition of entirely new language to the Plan, and when taken out of context, it misconstrues
(continued...)

Aetna, claiming that they improperly terminated her long-term disability benefits. The district court dismissed Aetna as an improper party, denied Mote's cross-motion for summary judgment, and granted the Plan's cross-motion for summary judgment. Mote appeals.

## II.

We review a district court's decision on summary judgment de novo. *Davis v. Unum Life Ins. Co. of Am.*, 444 F.3d 569, 574 (7th Cir. 2006) (citations omitted). "Summary judgment is proper when the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' " *Tegtmeier v. Midwest Operating Eng'rs Pension Trust Fund*, 390 F.3d 1040, 1045 (7th Cir. 2004) (quoting Fed. R. Civ. P. 56(c)). "With cross-motions, our review of the record requires that we construe all inferences in favor of the party against whom the motion under consideration is made." *Id.* (quotations and citations omitted).

---

[3] (...continued)
the text of the Plan's letter. Also, the dissent does not mention that the sentence that it quotes is surrounded by a full analysis detailing the Plan's rationale for its prior decision and the medical evidence Mote presented for reconsideration. Following the quoted statement, the Plan's letter goes on to express its rationale for denying the request for reconsideration. When read in context, it is clear that the quoted statement does not indicate that the Plan began its analysis with the premise that reported pain can never be enough.

On appeal, Mote first argues that the Plan's decision to stop paying her benefits after finding that she did not meet the stricter five-year definition of "total disability" was arbitrary and capricious. In *Firestone Tire & Rubber v. Bruch*, 489 U.S. 101 (1989), the Supreme Court held that " 'a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan.' " *Diaz v. Prudential Ins. Co. of Am.*, 424 F.3d 635, 636-37 (7th Cir. 2005) (quoting *Firestone*, 489 U.S. at 115). "When, as here, the terms of an employee benefit plan afford the plan administrator broad discretion to interpret the plan and determine benefit eligibility, judicial review of the administrator's decision to deny benefits is limited to the arbitrary-and-capricious standard." *Davis*, 444 F.3d at 575 (citing *Sisto v. Ameritech Sickness & Accident Disability Benefit Plan*, 429 F.3d 698, 700 (7th Cir. 2005)).

Under the arbitrary and capricious standard, "we will overturn a plan administrator's decision 'only . . . if it is downright unreasonable.' " *Herman v. Cent. States, Se. & Sw. Areas Pension Fund*, 423 F.3d 684, 692 (7th Cir. 2005) (quoting *Carr v. Gates Health Care Plan*, 195 F.3d 292, 294 (7th Cir. 1999) (internal quotation omitted)). "That is, this court will not substitute the conclusion it would have reached for the decision of the administrator, as long as the administrator makes an informed judgment and articulates an explanation for it that is satisfactory in light of the relevant facts." *Id.* (internal quotations and citations omitted). We previously have noted that " '[r]eview under the deferential arbitrary and capricious standard is not a rubber stamp,' so that, '[e]ven under the deferential re-

view we will not uphold a termination where there is an absence of reasoning in the record to support it.' " *Id.* at 693 (quoting *Hackett v. Xerox Corp. Long-Term Disab. Income*, 315 F.3d 771, 774-75 (7th Cir. 2003)). "A satisfactory explanation is one that gives 'the specific reasons for the denial,' but it need not explain 'the reasoning behind the reasons, . . . [that is,] the interpretive process that generated the reason for the denial.' " *Id.* (quoting *Gallo v. Amoco Corp.*, 102 F.3d 918, 922 (7th Cir. 1996) (internal quotation omitted)). Further, we have found that "[t]he administrator of a pension fund does not act arbitrarily and capriciously when he changes a previous decision because the facts known to the plan have changed; '[p]ut simply, a reversal based on new information is not a non-uniform interpretation.' " *Id.* (quoting *Militello v. Cent. States, Se. & Sw. Areas Pension Fund*, 360 F.3d 681, 690 (7th Cir. 2004)).

   In this case, Mote first argues that the Plan's decision was arbitrary and capricious because there was no evidence in the record that her condition improved. Mote contends that a finding of improvement is necessary because the Plan actually terminated her benefits under the "own occupation" definition of "totally disabled," rather than the five-year, "any occupation" definition. Thus, she reasons that if the Plan found that she could not perform her position as a human resource generalist in 1998, and there is no evidence that her chronic back pain or fibromyalgia had improved, then the Plan had no basis for terminating her benefits. As discussed above, the totality of the evidence indicates that the Plan terminated Mote's benefits based on the five-year, "any occupation" definition. *See supra*, at n.1. Because that definition differs significantly from the more lenient "own occupation"

definition, we find that even if Mote's condition did not improve over the five-year period she was receiving disability benefits, that is not determinative of whether she was "totally disabled" under the five-year definition. Accordingly, we evaluate whether the Plan arbitrarily and capriciously evaluated the evidence before it in making its determination that Mote was capable of performing some occupation, rather than merely her previous occupation.

Mote next asserts that the Plan did not properly weigh her treating physicians' opinions in reaching its termination decision. Mote's argument is unavailing, however, because "ERISA does not require plan administrators to accord special deference to the opinions of treating physicians." *Kobs v. United Wis. Ins. Co.*, 400 F.3d 1036, 1039 (7th Cir. 2005) (citations omitted). Further, courts may not "impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." *Davis*, 444 F.3d at 578 (quoting *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003)). We also have recognized that "[m]ost of the time, physicians accept at face value what patients tell them about their symptoms; but insurers . . . must consider the possibility that applicants are exaggerating in an effort to win benefits (or are sincere hypochondriacs not at serious medical risk)." *Leipzig v. AIG Life Ins. Co.*, 362 F.3d 406, 409 (7th Cir. 2004). Accordingly, the Plan did not act improperly when it looked to, and credited, evidence that conflicted with Mote's treating physicians' opinions as part of its deliberative process in evaluating her claim.

Mote further argues that the Plan's reviewing doctors' opinions regarding her condition were unreliable and

rendered the Plan's decision arbitrary and capricious. Specifically, Mote takes issue with the fact that none of the Plan's physicians consulted a rheumatologist with specialized expertise in fibromyalgia, nor did the Plan contact her treating physicians to discuss her fibromyalgia. As a threshold matter, an ERISA plan is not required to hire specialists for every claimed malady in cases in which the plan hired an independent expert to conduct a physical examination of the claimant. In this case, the Plan hired an independent expert, orthopedic surgeon Richard Tuttle, M.D., to examine Mote. The record indicates Dr. Tuttle conducted an "18 tender points" examination of Mote to assess her fibromyalgia, which was the same test that Mote's own physician, Dr. Gruft, conducted. While Mote seeks to impose a requirement on the Plan to consult with her treating physicians, the record reveals that Dr. Gruft is a pain management specialist and not a rheumatologist, and that Lee Lichtenberg, M.D., who is a rheumatologist, only examined Mote once. Moreover, nothing in the record indicates that Mote's primary care physician, Dr. West, has any particular expertise in fibromyalgia. In addition to hiring Dr. Tuttle to examine Mote, the Plan also relied upon the opinions of William Hall, whose specialty is unknown, and Paul Radford, an occupational medicine specialist. While neither of these consultants is a rheumatologist, the fact remains that Mote sought long-term disability benefits on grounds other than fibromyalgia, including chronic back pain, migraine headaches, and irritable bowel syndrome, all of which Drs. Tuttle, Hall and Radford are just as qualified to opine about as Mote's treating physicians. Accordingly, we do not find that the Plan's reliance on the opinions of Drs. Tuttle, Hall and Radford, in conjunction with the treating records of Mote's own physicians, as well as

other outside evidence gathered during its deliberative process, rendered its decision either arbitrary or capricious.[4]

Next, Mote argues that Dr. Hall's and Dr. Radford's opinions are suspect simply because the Plan hired them. Mote's assertion that the Plan's employees or its consultants had an incentive to deny her claim is without support in the record. As we recognized in *Leipzig v. AIG Life Insurance Co.*, "most insurers are well diversified, so that the decision in any one case has no perceptible effect on the bottom line," and thus "[t]here is correspondingly slight reason to suspect that they will bend the rules," absent suspect circumstances such as "an insurer or plan administrator pay[ing] its staff more for denying claims than for granting them." 362 F.3d at 409 (citing *Perlman v. Swiss Bank Corp.*, 195 F.3d 975, 980-81 (7th Cir. 1999)). As we have

---

[4] On appeal, Mote also raises for the first time the following arguments: (1) that Dr. Radford was not qualified to render an opinion because he is an occupational medicine specialist; (2) that Dr. Tuttle did not have the entire record to review before his independent medial examination; and (3) that Drs. Tuttle, Radford, and Hall were opining outside their respective scopes of expertise when they determined that Mote could work at a sedentary occupation. Because Mote failed to raise those arguments in the district court, she has waived her opportunity to raise them at this stage. *Taubenfeld v. AON Corp.*, 415 F.3d 597, 599 (7th Cir. 2005) (citing *Heller v. Equitable Life Assurance Soc'y*, 833 F.2d 1253, 1261-62 (7th Cir. 1987) ("On numerous occasions we have held that if a party fails to press an argument before the district court, he waives the right to present that argument on appeal . . . . As we have made clear, it is axiomatic that arguments not raised below are waived on appeal." (citations and quotation marks omitted))).

stated previously, ERISA "plan administrators have a duty to all beneficiaries and participants to investigate claims and make sure to avoid paying benefits to claimants who are not entitled to receive them." *Davis*, 444 F.3d 575 (citations omitted). Accordingly, the Plan would have been remiss if it did not investigate Mote's long-term disability claim, and its use of independent experts and medical consultants not only was justified, but consistent with its duty to investigate.

Mote also asserts that the Plan's reliance on the results of her November 11, 2002, functional capacity examination ("FCE") was unreasonable. In his report, the FCE evaluator concluded that Mote "is currently capable of working at the sedentary physical demand level within the material handling and positional tolerances set forth in the report, of an eight hour day." Despite that conclusion, Mote asserts that the FCE evaluator's opinion was not supported by the evaluation findings regarding her severe pain, and that the Plan "cherry-picked" selected portions of the FCE report to justify its termination of her long-term disability benefits. Her argument fails, however, because the Plan never stated that the FCE was the deciding factor in its decision. Rather, the Plan advised Mote that it considered that FCE in tandem with Dr. Tuttle's September 15, 2003, independent medial examination. The Plan's December 8, 2003, letter also advised Mote that both examinations revealed that she possessed greater physical capability than that stated in her subjective medical history, and that both examinations supported a conclusion that she could work at a sedentary position for a eight-hour work day. Accordingly, we find that the Plan's consideration of Mote's November 11, 2002, FCE as one component of its deliberative process did not make its

decision to terminate Mote's long-term disability benefits either arbitrary or capricious.

Mote then contends that Dr. Hall's opinion is suspect because he changed his conclusion after viewing the videotape snippets of her daily activities and that the Plan's consideration of the videotapes during its deliberative process was improper. These argument also are without merit. In *Shyman v. Unum Life Insurance Co.*, 427 F.3d 452 (7th Cir. 2005), we considered an ERISA plan's denial of benefits decision, which partially was based on evidence gathered by a private detective that contradicted claimant's disability claims. *Id.* at 456. We did not object to the plan's surveillance of the claimant, and we held that the plan's denial decision was neither arbitrary nor capricious. *Id.*; *see also Dougherty v. Indiana Bell Telephone Co.*, 440 F.3d 910, 917 (7th Cir. 2006) (upholding ERISA plan's decision to terminate disability benefits after surveillance videotape showed the claimant engaging in normal, everyday activities, such as driving his car and hauling shopping bags). Mote attempts to distinguish these cases by arguing that the videotapes in this case do not contain evidence contradictory to her treating physicians' diagnoses, and thus the Plan could not reasonably have relied upon them in its deliberative process. The evidence in the record, however, rebuts Mote's argument. For example, Dr. Gruft opined that Mote "cannot operate a motor vehicle," but the videotape shows Mote doing just that. The videotapes also contradict Dr. Gruft's claim on his December 11, 2003, Functional Capacity Worksheet that Mote could "never climb, crawl, kneel, move repeatedly or stoop," but the surveillance videotape shows her kneeling, moving repeatedly, and stooping. In short, the videotapes show Mote engaging in many of the

activities that she claimed to be unable to accomplish in her application for long-term disability benefits and, consequently, the Plan properly considered them. Further, Dr. Hall was justified in altering his opinion regarding Mote's ability to work after viewing the videotapes, because Mote's activities on the videotapes were exactly the type of additional, contrary evidence upon which he conditioned his original opinion when he stated that, "absent medical or personal information regarding [Mote] to the contrary, her subjective musculoskeletal symptoms are of such severity as to be totally limiting." Finally, the record reflects that the Plan relied upon the videotapes merely as one piece of the puzzle in its deliberative process and, while they may have altered the outcome, they were not the sole basis for the Plan's denial of Mote's claim. Accordingly, we find that the Plan's use of the videotape evidence of Mote's physical capacity did not render its decision either arbitrary or capricious.[5]

---

[5] The dissent takes issue with the Plan's use of portions of the surveillance videotapes, and attempts to draw conclusions regarding Mote's activities depicted on the videotapes. As the parties indicated during oral argument, neither the snippets of the videotapes viewed by Dr. Hall, nor the raw footage, are in the record. We are thus unable to review either set of videotapes to determine whether the parties' representations regarding the substance of those videotapes are accurate. What is in the record, however, are Dr. Hall's statements regarding their content after he reviewed them, as well as the records from the investigators who conducted the surveillance. Based on those memorialized accounts in the record, there is ample evidence that the activities in which Mote engaged conflicted with her representations regarding her functional abilities. Even if this

(continued...)

Mote further argues that the Plan was estopped from asserting that she was not totally disabled because the Social Security Administration ("SSA") later found Mote to be disabled under its standards. Mote, however, ignores the fact that the Plan's five-year definition of "totally disabled," and the standard used in other ERISA plans, is not the same as the standard used for evaluating disability under the Social Security Act, 42 U.S.C. § 423(d)(1)(A). *See Nord*, 538 U.S. at 833 ("In determining entitlement to Social Security benefits, the adjudicator measures the claimant's condition against a uniform set of federal criteria. '[T]he validity of a claim to benefits under an ERISA plan,' on the other hand, 'is likely to turn,' in large part, 'on the interpretation of terms in the plan at issue.'" (quoting *Firestone*, 489 U.S. at 115)). We previously have stated that a court may consider SSA determinations as relevant, and an SSA decision could be binding if an ERISA plan specifically includes SSA disability as a condition of plan disability. *Reich v. Ladish Co.*, 306 F.3d 519, 524-25 (7th Cir. 2002). The Plan, however, did not include any provisions regarding SSA decisions

---

[5] (...continued)

is a close call, there is insufficient contrary evidence to conclude that the evidence presented on the videotapes rendered the Plan's decision arbitrary and capricious.

Moreover, if Mote believed that the portions of the surveillance videotapes relied upon by the Plan were not representative of her functional abilities, or if she believed the videotapes had been edited to omit evidence that supported her claim, she was free to submit that evidence to the court. Mote elected not to submit any portion of the surveillance videotapes, and thus it is not a proper function of this court to speculate on what the videotapes may or may not have shown.

in its policy. Further, even if the SSA's decision could have had some bearing on the Plan's decision, the Plan was unable to consider it because the SSA did not award benefits to Mote until May 24, 2005, eight months after the Plan issued its decision. *See Tegtmeier*, 390 F.3d at 1046 ("While Social Security decisions, *if available*, are instructive, these determinations are not dispositive . . . ." (emphasis added)). Accordingly, the Plan was not estopped from independently interpreting the terms of its policy merely because the SSA found Mote to be disabled pursuant to its standards months after the Plan issued its final decision to terminate Mote's long-term disability benefits.

Finally, Mote contends that the district court erred by dismissing her claims against Aetna upon its finding that Aetna was not a proper party to the action. She asserts that she should be able to sue both her employer's ERISA plan (i.e., the Plan) and the Plan's administrator, Aetna. Generally, in a suit for ERISA benefits, the plaintiff is "limited to a suit against the Plan." *Blickenstaff v. R.R. Donnelley & Sons Co. Short Term Disability Plan*, 378 F.3d 669, 674 (7th Cir. 2004). While we have allowed plaintiffs in ERISA cases to sue an ERISA plan administrator in some limited instances, the operative facts of those cases differ from those in this case. For instance, in *Riordan v. Commonwealth Edison Co.*, 128 F.3d 549, 551 (7th Cir. 1997), we permitted a plaintiff to sue the plan administrator to recover ERISA benefits because the employer failed to raise the issue in the district court and the plan documents referred to the employer and the plan interchangeably. Neither of those pivotal facts is present here. Similarly, in *Mein v. Carus Corp.*, 241 F.3d 581 (7th Cir. 2001), we allowed a plaintiff to sue his employer to recover ERISA benefits because the employer and the plan

were closely intertwined. *Id.* at 584-85. We are not faced with that situation in this case, since Aetna was not Mote's employer and the Plan's policy distinguishes between the Plan, the employer, and Aetna. We thus find that the district court did not err in dismissing Aetna from the suit because it was not a proper party to the action.


### III.

The district court properly entered summary judgment for the Plan and denied Mote's motion for summary judgment because the Plan's decision to terminate Mote's long-term disability benefits was neither arbitrary nor capricious, and because the Plan was not estopped from terminating Mote's benefits based upon the Social Security Administration's subsequent finding that Mote was disabled under its regulations. The district court also properly dismissed Mote's claims against Aetna because Aetna was not a proper party to the action. Accordingly, the district court's judgment is AFFIRMED.


WOOD, *Circuit Judge*, concurring in part and dissenting in part.  In fact-specific cases like this one, the court of appeals is usually *de facto* the last stop on the road for the litigants. It is thus critical that we get the facts right, even if we agree on the governing legal standards. Here, although I agree with the majority's assessment of the claims

against Aetna, the administrator of the plan at issue, I must part ways with its evaluation of Brenda Mote's claims against the long-term disability plan ("the Plan"). According to Mote's treating physicians and other specialists, since at least 1998 she has suffered from fibromyalgia, migraines, a sleep disorder, depression, and pain throughout her body. From 1998 to 2003, she received benefits from the long-term disability plan sponsored by her former employer, Arthur Andersen. In 2003, Mote's disability benefits were terminated because the length of Mote's disability triggered a shift in the applicable standard for disability, from the earlier one in which she needed to show that she could not perform her own job, to the more stringent one in which she needed to show that she could not perform any work at all. Mote appealed the decision, but the Plan affirmed itself. Mote then filed this suit in federal court, alleging that the Plan's decision to terminate her benefits was arbitrary and capricious.

Although arbitrary and capricious review ties our hands considerably, it is "not a rubber stamp." *Hackett v. Xerox Corp. Long-Term Disability Income Plan*, 315 F.3d 771, 774 (7th Cir. 2003). We have held that a benefits plan governed by ERISA "must weigh the evidence for and against [a benefits determination], and within reasonable limits, the reasons for rejecting evidence must be articulated." *Halpin v. W.W. Grainger, Inc.*, 962 F.2d 685, 695 (7th Cir. 1992) (internal quotation marks omitted). Further, "ERISA requires that specific reasons for denial be communicated to the claimant and that the claimant be afforded an opportunity for 'full and fair review' by the administrator." *Id.* at 688.

I see two significant problems in the Plan's consideration of Mote's appeal, either one of which would require

reversal even under arbitrary and capricious review. First, in denying Mote's appeal on September 28, 2004, the Plan made the following statement: "Reported pain also cannot be relied upon as [a] sufficient indicator of functional impairment since perception of pain may be affected by individual tolerance, motivation or psychological factors." Perhaps if this plan had language in it to that effect, that conclusion might be acceptable. But most plans do not, and this one is no exception. To the contrary, section VII, which includes the governing definitions for the Plan, says only that "total disability/totally disabled" means

> that solely because of an illness, pregnancy or accidental bodily injury, an insured employee is unable: (1) [d]uring the first 5 years of disability to perform the material duties of the employee's own occupation; and (2) [f]rom then on, to work at any occupation for which such employee is, or may reasonably become, fitted by education, training or experience. The availability of employment will not be considered in the assessment of the employee's disability.

Plan, sec. VII, ¶ 29. In other words, the Plan takes a functional approach to disability. It does not forbid an employee from showing functional incapacity through self-reported symptoms. The ability to "interpret" cannot mean the ability to add entirely new language to plans. In my view, Mote's case is indistinguishable from another ERISA case involving fibromyalgia, in which we held that subjective reports of pain can suffice to show one's complete disability. *Hawkins v. First Union Corp. Long-Term Disability Plan*, 326 F.3d 914, 918 (7th Cir. 2003). The Plan therefore made an error of law, or behaved arbitrarily and capriciously, in its analysis. Although it was entitled to

credit evidence other than Mote's own reports of pain, it cannot begin with the premise that reported pain can never be enough.[1]

_____

[1] My colleagues believe that the Plan's letter of September 28, 2004, taken as a whole, does not rest on the premise that reported pain can never be enough, but I see nothing in the letter that qualifies the statement quoted above. Page 1 of the letter summarizes the Plan's conclusion that Mote is not entitled to relief and sets forth the definition of disability from the Plan. From the bottom of page 1 through the middle of page 2, the letter reviews Mote's medical history. It then states that

> [a]vailable medical records do not include references to clinical, laboratory or radio-graphic findings of progressive or worsening organic illness, or to severe or intractable medication side effects. They also do not furnish descriptors of severity of your musculoskeletal symptoms or other subjective symptoms. Although your subjective musculoskeletal symptoms are credible, they are not accounted for by identifiable neurological or musculoskeletal pathology.

In my view, the only way to read this letter is that Mote's reported pain is insufficient to justify relief.

The only other items to which the letter refers are the surveillance evidence, which for the reasons I outline later is insufficient to support the Plan's conclusions, and an Independent Medical Examination ("IME") conducted by a Dr. Tuttle on September 15, 2003. Dr. Tuttle was commissioned by the defense to examine Mote, but his examination could only have been as good as the data he had. As Mote pointed out in her brief, both his background and the file he consulted were deficient. Dr. Tuttle was given only a partial record to review and "lacked the appropriate medical specialization to evaluate a fibromyalgia claim." Based on his one-time examination of

(continued...)

The Supreme Court's decision in *Black & Decker Disability Plan v. Nord* warns that "Plan administrators, of course, may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician," even though the administrators have no obligation "to accord special weight to the opinions of a claimant's physician." 538 U.S. 822, 834 (2003). In this case, even if there were some language in the Plan on which the administrators could hang their conclusion that subjective evidence is never enough to support an award of benefits, the Plan still failed to articulate its "reasons for rejecting evidence," which is necessary "if there is to be meaningful appellate review." *Halpin*, 962 F.2d at 695. It may be that even under the correct standards, a weighing of all the evidence would lead once again to a rejection of her claim. Nonetheless, Mote is entitled to have the decision, whatever it is, reached through the use of a fair process. The record makes clear that this did not happen.

Second, although surveillance evidence can be used to undermine the credibility of a doctor's medical opinions where the diagnosis is based substantially on patient reports, whether it was used properly here depends on

---

[1] (...continued)

Mote, his review of an incomplete record of her medical history, and his viewing of the selective excerpts from the surveillance tapes, Dr. Tuttle stated that he could not "see any reason why [Mote] cannot return to a sedentary type of position at a full 8 hours a day." IME at 4. I fail to see how Dr. Tuttle's opinion, given these significant limitations, could constitute a valid basis for disregarding the informed and fully documented conclusions of Mote's treating physicians. Yet the Plan justified its decision to deny benefits based solely on this IME and the surveillance evidence.

how it was used and for what purpose. The record indicates that the Plan's medical reviewer, Dr. Hall, did not receive all of the surveillance information about Mote, which was gathered over days and days of observation. Instead, as the majority concedes, he received only a compilation of two hours of pre-selected footage. After reviewing this material and looking at no other new evidence, Dr. Hall withdrew his earlier conclusion that Mote was totally disabled from working in any occupation. The fact that the tapes themselves are not in the record does not somehow make Dr. Hall's conclusion reliable. No one disputes that he never saw the vast majority of the evidence that was collected. One might just as well view a two-hour snippet of Mote sitting on a sofa, and conclude that this was all she ever did. Dr. Hall's opinion was based on inherently unreliable evidence and thus should not have been entitled to any weight.

Properly used, surveillance evidence can provide a basis for choosing between contradictory medical evidence by rendering some of that evidence less credible. This court has noted that "[w]e can imagine an argument that even if the activity disclosed . . . does not indicate a capacity to engage in full-time work, the fact that it is discrepant with the level of activity described by [the treating physician], presumably on the basis of representations made to him by [the plaintiff], fatally undermines [the plaintiff's] credibility." *Hawkins*, 326 F.3d at 918. Here, the Plan contends that the surveillance evidence was used to discredit the treating physicians' statements and not as an independent basis for terminating Mote's benefits, but the record belies this assertion.

Mote may well have concluded that there was no need to supplement the record before this court by furnishing all of

the surveillance tapes, because even the evidence that Dr. Hall viewed was generally consistent with the records from Mote's treating physicians. One problem with the way in which the Plan used the surveillance evidence is the fact that it made assumptions that find no support in the record. Thus, for example, in its 2004 denial of Mote's appeal, it described the activities viewed in surveillance as Mote's "daily living activities," even though the record contains no evidence that these activities were daily or even regular. As I have already noted, the record contains only the pre-edited, two-hour videotape that, in essence, constitutes a highlight reel of Mote's most active moments during several days of surveillance. There would have been no need to plant cameras inside Mote's home in order to collect evidence that fairly reflected her ordinary activities; a fair look at the days' worth of footage actually obtained would have sufficed.

Most troubling to me is that when the activities observed by surveillance are put in context, their utility in assessing Mote's level of disability appears flimsy at best. Mote's medical records state that Mote "overdoes it. Others aware of her overdoing it and depend on it. Patient aware of need for changes." We have recognized in the past that some disabled people manage to keep going only through superhuman efforts; in those circumstances their activities do not negate the fact that they are disabled. See *Perlman v. Swiss Bank Corp. Comprehensive Disability Protection Plan*, 195 F.3d 975, 983 (7th Cir. 1999). In 1999, Dr. Gruft noted that Mote had a goal of setting boundaries with her mother (who is also disabled) and setting limits with others generally. The only days where Mote was observed undertaking any significant activity were the days she drove her mother to and from her mother's doctor's

appointments (once in July 2001 and once two years later in January 2003). Her activities that day included eating at a restaurant with her mother, where she sat for one hour, and standing up for two minutes after approximately 30 minutes of sitting. The other day of surveillance came on a day where Mote was required by the Plan to undergo a functional capacity evaluation. She drove 45 minutes each way to that appointment. Although these contextual details are in the surveillance notes, there is no indication that Dr. Hall had access to the written notes or that they were incorporated into the video that he watched. Notably, Mote cancelled the second day of her evaluation because she was in pain. Although one of Mote's treating physicians noted in her medical records that Mote could not operate a motor vehicle, this observation accompanied a new prescription for a sedative. It is entirely possible that the doctor meant to warn against operation of a motor vehicle while taking the drug, rather than to describe Mote's ability to drive. The tape showing Mote picking up her mail and newspapers at the end of her driveway included observations that she limped to the end of the driveway, that the limp significantly worsened on the walk back to the house, and that Mote struggled twice with the newspaper, and so I am unable to see how this helps the Plan's arguments at all.

Other courts have concluded that segments of surveillance showing light physical activities by a plaintiff do not amount to a showing that she is able to manage full-time employment. See *Osbun v. Auburn Foundry, Inc.*, 293 F. Supp. 2d 863, 870 (N.D. Ind. 2003) ("[Surveillance] evidence that [the plaintiff] can perform light physical tasks for 1.5 hours over two days falls far short of demonstrating that he is capable of sustaining a job. [The defen-

dant] produced no evidence showing how long [the plaintiff] can perform such tasks, whether he can perform them on a daily basis, or how much pain he must endure in the process."); *Crespo v. Unum Life Ins. Co. of Am.*, 294 F. Supp. 2d 980, 996 (N.D. Ill. 2003) (finding, in a claim of disability due to fibromyalgia, that the defendant's "comparison between [the plaintiff's] daily activities and the requirements of a full-time job is misplaced," as "[t]here is no evidence anywhere in the record that [the plaintiff] undertakes these activities [including taking walks and performing household chores] with the regularity and structure of a full time job"); see also *id.* (noting that claimants need not "become inert in order to avoid having their disability benefits denied").

Viewed in any light, the surveillance evidence in Mote's case is nothing like what this court faced in *Shyman v. Unum Life Ins. Co.*, 427 F.3d 452, 456 (7th Cir. 2005), which involved an allegedly bedridden man coaching basketball and baseball teams. Mote's evidence demonstrates that she was not capable of functioning in any capacity within the workforce. Surely there is room to conclude that a person is totally disabled from working without requiring that she be bedridden and immobile during every second of the day. The Plan's apparent assumption that only something this extreme would disable her from working is, or could be viewed by a finder of fact to be, arbitrary and capricious.

Before concluding, I note with some concern that the actual plan underlying this claim is shrouded in mystery. Bizarrely, at oral argument, defense counsel acknowledged that although he represents both Aetna and the Plan, his only direction in this case came from Aetna. Aetna, however, was dismissed from the case at the district court level,

and all three judges on this panel agree that this was correct. It is odd, at best, that Aetna therefore seems to be handling the litigation on appeal and that the Plan is nowhere to be found. The evidence of the Plan was also handled carelessly. Mote attached a copy of the long-term disability insurance contract between Arthur Andersen and Aetna to her complaint, entitled "Long-Term Disability Policy," rather than another document, entitled "Arthur Andersen LLP Group Long Term Disability Insurance Plan," which appears later in the record. Both Mote and the defendants refer to the first document as the plan at issue in this case. In the insurance contract, obligations are imposed on "Aetna" and the "policyholder" throughout, with Arthur Andersen (Mote's former employer) identified as the policyholder. In the latter document, which seems to be the actual plan at issue, obligations are imposed upon the "Administrator," "Fiduciary," and "Appeals Fiduciary," as one would expect. Arthur Andersen, which is defunct at this point, is named as the Plan Administrator, while both Fiduciary roles are filled by Aetna.

Given these two documents, it is unclear how an employee would know which plan document she should rely upon, who was in charge of the Arthur Andersen long-term disability plan, or if the Plan was its own entity separate from Aetna. The employee would need to consult both plans, which notably have similar but not identical definitions of disability. Mote has not pressed this issue in support of any of her arguments, and so we do not need to consider its implications on the case at hand. It does help to explain, however, some of the problems in this case.

Because, in my view, Mote has raised genuine issues of fact on the question whether Aetna's determination (or,

more accurately, the Plan's) that she could not show inability to perform any job in the economy was arbitrary and capricious, I would reverse the district court's grant of summary judgment in favor of the Plan and remand for further proceedings. I therefore respectfully dissent.

A true Copy:

      Teste:

_____
*Clerk of the United States Court of
Appeals for the Seventh Circuit*